558 So.2d 1285 (1990)
John Paul HOBGOOD and Hobco, Inc.
v.
Eugene J. AUCOIN, Jr., Marine Electric Corporation, now doing business as Continental Electric Service Corporation, and the Travelers Insurance Company.
No. CA 88 0910.
Court of Appeal of Louisiana, First Circuit.
February 21, 1990.
Writ Granted June 1, 1990.
*1286 Joseph L. Waitz, Waitz & Downer, Houma, for plaintiff-appellant.
John Blackwell, Gibbens & Blackwell, New Iberia, for defendants-appellees.
Before EDWARDS, LANIER and FOIL, JJ.
LANIER, Judge.

ON REMAND
This is a suit for damages in tort arising out of an automobile accident. The plaintiffs are Hobco, Inc. (Hobco) and John Paul Hobgood, an employee and the major stockholder of Hobco. The defendants are Eugene J. Aucoin, Jr. (Aucoin), his employer, Marine Electric Corporation (Marine) and their insurer, Travelers Insurance Company (Travelers). Hobco sought damages asserting Hobgood "was unable and will be unable in the future to perform his customary work for Hobco, Inc." Aucoin and Travelers filed a peremptory exception raising the objection of no cause of action which asserted Hobco had "no cause of action for personal injuries sustained by its employee, Paul Hobgood." The trial court sustained this exception. On appeal this court affirmed that judgment in an unpublished opinion. No writ was taken from this ruling and it is now definitive. Prior to trial, liability was admitted and the parties stipulated Hobgood's recovery would not exceed the $500,000 limit of Travelers' insurance coverage. In addition, Marine and Aucoin were dismissed as parties defendant. The trial court rendered judgment awarding Hobgood $100,000 for general damages, $6,082 for past medical expenses, and $12,000 for future medical expenses, for a total award of $118,082. The trial court denied Hobgood's claim for loss of income. Travelers deposited the principal and interest due on this judgment ($178,669.87) into the registry of the court, and Hobgood withdrew these funds without waiving his right to appeal. Hobgood took a devolutive appeal.
On appeal, Hobgood assigned three errors in the trial court judgment: (1) the trial court erred in not awarding loss of *1287 earnings during the time needed for future surgery and rehabilitation; (2) the trial court erred in not awarding loss of past and future earnings due to Hobgood's disabilities; and (3) the trial court erred in not awarding damages for diminution of earning capacity. In an unpublished opinion a majority of a three judge panel of this court held that the trial court was not clearly wrong in finding as fact that Hobgood failed to prove entitlement to those three elements of damage. The dissenter noted that Hobgood's expert economist "testified at length as to diminution of earning capacity," observed that the "expert's testimony was not discredited in any way," and concluded that Hobgood was entitled to "a substantial award ... for diminution of earning capacity." Hobgood applied to the Louisiana Supreme Court for a supervisory writ asserting this court committed error: (1) by "not awarding damages for future loss of earnings and/or diminution of earning capacity while recognizing the need for future surgery and awarding expenses for such," and (2) because our decision in the instant case conflicted with Henry v. National Union Fire Insurance Company, 542 So.2d 102 (La. App. 1st Cir.), writ denied, 544 So.2d 405 (La.1989). The Louisiana Supreme Court, at 551 So.2d 1306 (La.1989), peremptorily acted on the writ application with the following per curiam:
Granted in part, denied in part. The decision of the court of appeal is reversed insofar [sic] it denies relator recovery for diminution of earning capacity. Under the facts of this case, relator has shown a loss of earning capacity. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). The court of appeal is ordered to review the record and fix relator's damages for loss of earning capacity according to the guidelines established therefor in Philippe v. Browning Arms, 395 So.2d 310, 317 (La.1980), and Coco v. Winston Industries, 341 So.2d 332, 338 (La.1976). Otherwise, the application is denied.
Thus, the judgments of this court holding that the trial court was not manifestly erroneous in determining that Hobgood failed to prove loss of future earnings and that the instant case was not in conflict with the Henry case[1] are now definitive. The only issue to be decided in this remand is the amount of Hobgood's award for diminution of earning capacity (ability).

BASIC FACTS
On November 2, 1982, at approximately 12:00 noon, Hobgood was operating his automobile in a westerly direction on Highway 90 West, in St. Mary Parish, Louisiana. While stopped for a left turning automobile, Hobgood's vehicle was struck from the rear by a 1980 GMC pickup truck owned by Marine and driven by Aucoin. Aucoin was an employee of Marine and was acting in the course and scope of his employment.

DIMINUTION OF EARNING CAPACITY
In his original brief in this court, Hobgood asserted the following:
Considering plaintiff's past activities on the job, he will be fairly limited by doctor's restrictions as to sitting, standing and walking.... The plaintiff feels a fair award for diminution of earning capacity would be around $200,000.00. This amount is the total of an additional $10,204.08 for each year of plaintiff's work life expectancy, being 19.6 years. Recall, plaintiff's restrictions after surgery will limit his mobility and also limit furtherance of this company and future employment.

Hobgood's Medical Condition
Hobgood was born on January 18, 1945. The accident occurred on June 2, 1981, *1288 when he was 36 years of age. Immediately after the accident Hobgood went to the emergency room of the Lakewood Hospital in Morgan City, Louisiana, where he was treated. He was released after two hours and returned to Houma, Louisiana, where he saw Dr. Dexter Gary. During the period of November, 1982, until April 29, 1983, Hobgood continued to see Dr. Gary (or someone in his medical group) and went to the Ochsner Hospital for diagnostic studies. Hobgood's condition was diagnosed as cervical and lumbar strains. A strain is an injury to the muscles and ligaments. Conservative treatment was recommended and pursued.
From April of 1983, until the time of trial on November 4, 1987, Hobgood was seen and treated at various times by Dr. J. Michael Flynn, a chiropractor, Dr. Richard Warren Levy, a neurosurgeon, Dr. Stuart I. Phillips, an orthopedic surgeon, Dr. William H. Kinnard, an orthopedic surgeon, and Dr. Gary. During this period of time Hobgood's medical condition gradually worsened.
Hobgood had his last visit with Dr. Phillips on July 21, 1987. He complained that his condition was getting worse and told Dr. Phillips he was using a cane because his right leg was giving away. Dr. Phillips examined him and found muscle spasms, limited motion and a positive straight-leg raising test.
Hobgood saw Dr. Kinnard in May of 1987 because his condition was getting worse. Dr. Kinnard had a magnetic resident imaging (MRI) test performed on Hobgood which showed: (1) degenerative arthritic changes at the C-4, C-5 and C-6 disc levels with no spinal cord impingement, (2) some degenerative changes at the T-6 and T-7 disc levels, (3) a mild, central bulge of the disc at the L-4 level, and (4) compression of the fecal sac at the L-5 disc level. On September 24, 1987, Dr. Kinnard had a myelogram performed on Hobgood which showed: (1) narrowing of the L-4/L-5 disc space, (2) a one to two-millimeter bulge at L-4, and (3) a bulging disc at C-5.
The trial court found as fact that "the collision caused the arthritic condition to become symptomatic and either caused the disc bulge or caused it to become symptomatic." This factual question is no longer at issue.
Dr. Kinnard testified that future surgery was not necessary for Hobgood's cervical problem. Dr. Kinnard gave the following testimony at trial concerning surgery for Hobgood's lumbar problem:
Q. All right. How about the lumbar area?
A. Now, in the lumbar area he has a more advanced degree of degenerative changes and it's the same scenario in terms of the frequency and magnitude of pain, but we know already that he has disc protrusions that with the degenerative process worsening that its likely to cause an increased amount of symptoms and I think that surgery is a possibility on his back in terms of symptomatic relief.
Q. All right, sir. What would determine when he would have the surgery or require it?
A. If it became intolerable and interfered with normal, daily activities and he was not able to modify his activity level, his job status, etcetera to where he could get by.
Q. And the type surgery that would be performed would be a fusion?
A. It would predominately involve a fusion but as I mentioned if I were to go in I would also decompress that area of the spinal cord to give him more room, get rid of spurs and the disc protrusion to enable him to get a little bit more room and hopefully alleviate some of the symptoms that he's having.
Q. What is the percentage of success rate on that type of surgery, sir?
A. I'd say a seventy (70) percent. (Emphasis added)
In his deposition taken on November 2, 1987, Dr. Phillips gave the following testimony *1289 concerning surgery for Hobgood's lumbar condition:
Q. Now, there is some question of whether or not a surgical intervention may or may not be necessary to relieve his problem or to, if it can be, correct the problem he has or to even relieve the pain and the symptoms. Will you comment on that, Sir.
A. Surely. The indication for surgery in this condition would be pain that interferes with function. Basically in Mr. Hobgood it would be the ability to get out of bed and walk around, because I think that's the only thing that would lead him to surgery. If that does occur, then removal of the overgrown bone, removal of the bulging disc and probably fusion of the bones one to the other to prevent further degeneration would be in order. It's a large procedure. It requires two weeks' hospitalization, a year of rehabilitation, six months of that being in a brace. And aboutI'd say maybe 50 to 70 percent success rate. That would not be as successful an operation as a single-level disc surgery.
. . . . .
Q. And the various diagnostic tests that have since been done do confirm that at some point he is going to need some sort of surgical intervention; is that safe to say, or is that.
A. The tests that he has had previously done show a severely degenerative back. He is a relatively young adult; so, I think he has a very good chance of getting surgery in the future. (Emphasis added).
Hobgood gave the following testimony concerning future surgery:
Q. Mr. Hobgood, when you saw Dr. Phillips, have you made; well, let me ask you this way. Do you have any future surgical appointments or anything?
A. Several weeks ago I had scheduled after my last appointment with Dr. Phillips, when we discussed the possibilities of surgery for the lower back he told me that as far as any schedulings to do that with his nurse. I think her name is Jena at which time that was done. I spoke with her to get the schedule. I think we're looking at the; the week prior to Thanksgiving, which I think is the 16th for tests, 17th admit and the surgery is scheduled for the 18th. And, this is talking to her this week. This is what has been scheduled.
The record before us does not show that Dr. Phillips agreed to perform this surgery at the time stated by Hobgood. There is no evidence in the record to show that the surgery was actually performed.
Hobgood was given a 10% disability rating to his body as a whole. After surgery, he would have a disability rating of 25% to his body as a whole. The only restriction placed on Hobgood after the accident was to avoid activities that tend to make his condition worse and to use common sense. After surgery, Mr. Hobgood's restrictions will include: lifting restrictions in a range of 25 to 30 pounds on a regular basis, no repetitive pushing or pulling, no crawling, and no excessive bending.
Hobgood testified that prior to the accident he was "on the road" 8 to 12 hours per day and he worked 60 to 80 hours per week, but at the time of trial he was working 2 or 3 days a week. He can no longer travel the miles and work as long as he did prior to the accident. He discontinued going on long trips and going to rig locations. Hobgood stated he lost business because he could not make as many personal contacts with clients and phone calls were not as effective. He has hired an operations manager to take over some of the work he previously did. He has curtailed his hunting and fishing activities and no longer wrestles with his children.

Hobgood's Financial Condition
On June 2, 1981, Hobgood incorporated Hobco, Inc. At this time Hobgood owned *1290 80% of the Hobco stock. Hobco commenced business operations in the last quarter of 1981. Hobco initially was in the business of furnishing equipment and personnel to drilling rigs to test tubing as it is being run into the drill hole. Hobco was qualified as a Subchapter S corporation for federal income tax purposes. In a Subchapter S corporation, the corporate profits or losses are attributable to the individual stockholders; they are not attributable to the corporation, and the corporation pays no taxes. The Hobco financial records were kept on an accrual accounting basis. Accrual accounting is more accurate in showing how a business is operating because it considers accounts payable, accounts receivable and depreciation. However, Hobgood personally paid his federal income taxes on a cash accounting basis, that is, on the basis of cash actually received. Hobgood received a salary from Hobco (which was taxable) and he was required to declare Hobco's profits or losses on his income tax return. According to the testimony of Ronnie G. Broussard, the certified public accountant who did Hobgood's and Hobco's accounting, the relationship between Hobco's profits and losses and Hobgood's income tax return is as follows:
Q. All right, sir. There is a direct correlation and corresponding relationship between Hobgood's income and that of Hobco?
A. Yes, there is.
Q. Are tax returns filed by Hobco?
A. They are filed but what happens is they pay no tax. In turn they prepare a K-1 and the K-1 goes to the individual and the income presented on the K-1 is put on the individual's tax return.
Q. So, Mr. Hobgood pays all of the taxes?
A. Correct.
Thus, even though Hobco is no longer a party to these proceedings, its profits and losses are relevant insofar as they translate into income for Hobgood. Conversely, Hobco's financial condition is not relevant insofar as it does not translate into income loss or gain for Hobgood. Hobgood's federal income tax returns from 1978 through 1986 were filed of record. We do not find any Hobco "K-1" forms in the record before us.
Hobgood testified, and his 1981 tax return shows, that Hobco had a $75,190 loss in 1981. This tax return also shows that Hobgood had a salary income of $26,050, his wife had a salary income of $23,989, for a total salary income of $50,039. Because of the Hobco loss, the Hobgoods received a tax refund of $10,453 for taxes withheld during 1981.
Broussard testified that Hobgood received $48,000 in salary from Hobco in 1982. He also testified that Hobco had a $284,000 profit in 1982 as calculated on an accrual accounting basis (accrual). However, Hobgood's 1982 income tax return shows Subchapter S (S) income from Hobco (apparently on a cash accounting basis) of $29,152. Thus, Hobgood's salary and S income from Hobco in 1982 was a total of $77,152.
In 1983 Hobgood started an unincorporated equipment rental business called Hobgood Tong Service (Tong). The net profit from this business is shown on his 1983 tax return as $17,452. Broussard testified Hobgood received $48,000 in salary from Hobco in 1983. Hobgood's S income from Hobco in 1983 is shown as $4,899. Hobgood's total business income in 1983 was $70,351. Broussard testified Hobco's accrual loss was $25,000.
In 1984 Hobgood had salary income of $48,000, Tong income of $92,108 and a Hobco S income loss of $62,800, for a total net annual income of $77,308. Broussard testified Hobco's accrual profit was $25,000.
In 1985 Tong was merged into Hobco. Hobgood had a salary of $48,000 and S income of $34,964, for a total of $82,964. Broussard testified Hobco's accrual loss was $48,000.
In 1986 Hobgood had a salary of $48,000 and S income of $44,451, for a total of *1291 $92,451. Broussard testified Hobco's accrual loss was $55,000. Sometime prior to trial, Hobgood obtained ownership of 95% of Hobco's stock.
A recapitulation of Hobgood's business related income from 1982 through 1986[2] is as follows:

YEAR HOBGOOD'S INCOME HOBCO ACCRUAL
1982 $77,152 $284,000
1983 $70,351 -$ 25,000
1984 $77,308 $ 25,000
1985 $82,964 -$ 48,000
1986 $92,451 -$ 55,000

Hobgood's Earning Abilities
In his testimony at the trial Hobgood described his job training and experience as follows:
Q. Paul, going back, just briefly give me a rundown on your educational background.
A. Graduating from high school, West Field High School in 1963; attending Northeast Louisiana University; graduated from there in '68 with a Bachelor's; Masters in '72 and an Education Specialist Degree in 1975.
Q. All right. And your degree was in what?
A. In education.
Q. In education. Any particular specialty in education?
A. Physical education, Bachelor's Degree. The Masters was physical education. I think the related area being administration and supervision. And, the Education Specialist Degree was in administration supervision; related area being in media.
Q. All right, sir. Just briefly up to the present time; up to, say, the time of the accident, give me a rundown on your work history.
A. If we could include the summers while attending college, I spent time working offshore, working with diving crews, welding crews and upon graduation from college in '68 took a coaching and teaching position at Terrebonne High School in Houma. I stayed there six (6) years; took a sabbatical leave; went back to college and worked at a junior high for two (2) years while my wife was completing her doctorate. And, at that point I had the opportunity to go into oilfield sales, which I did for approximately a year with one particular company. Then, I went with another for three (3) years. After that period of time, which put us into the second quarter of 1981 when I started the process to open my own business which I incorporated June the 2nd, 1981.
Hobgood was not asked to give his actual or potential salaries in the various jobs he had prior to incorporating Hobco (except insofar as his 1978 through 1981 income tax returns reflected them). None of the doctors who testified were asked to give an opinion on how Hobgood's injuries would affect his various work capabilities, other than his work with Hobco. No rehabilitation expert was called to testify about Hobgood's work capabilities or limitations.

Applicable Law
The law applicable to determining diminution of earning capacity is set forth in *1292 Henry, 542 So.2d at 106-107, as follows:
A loss of future income award is not predicated merely upon the difference between a plaintiff's earnings before and after a disabling injury, but also encompasses the loss of one's earning potential or capacity, that is, the loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense.... Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured person could have earned despite the fact he may never have seen fit to take advantage of that capacity, if the injury has deprived him of a capacity he would have been entitled to enjoy, even though he never profited from it. Folse v. Fakouri, 371 So.2d 1120 (La.1979).
. . . . .
An award for loss of earning capacity is inherently speculative and cannot be calculated with absolute certainty. The most the courts can do is exercise sound discretion and make an award that in light of all facts and circumstances is fair to both parties while not being unduly oppressive to either.... Factors to be considered in fixing awards for loss of earning capacity include: age, life expectancy, work life expectancy, appropriate discount rate, the annual wage rate increase or productivity increase, prospects for rehabilitation, probable future earning capacity, loss of earning ability, and the inflation factor or decreasing purchasing power of the applicable currency.
. . . . .
The Louisiana Supreme Court has specifically ruled that "impairment of earning capacity cannot be calculated with mathematical certainty, and sound judicial discretion must be exercised after all proper considerations are weighed." Philippe v. Browning Arms Company, 395 So.2d 310, 317 (La.1980). Although the testimony of an expert economist is entitled to weight, it is necessarily based on uncertain future events and is not conclusive.
We have been specifically ordered by the Louisiana Supreme Court "to review the record and fix relator's damages for loss of earning capacity according to the guidelines established therefor in Philippe v. Browning Arms, 395 So.2d 310, 317 (La. 1980), and Coco v. Winston Industries, 341 So.2d 332, 338 (La.1976)."
In Philippe, the plaintiff was a dentist who lost the thumb on his right dominant hand when his shotgun accidentally discharged. The accident occurred in 1976 when Dr. Philippe was 42 years old and had a 21.5 to 28 year work life expectancy. Prior to 1976 Dr. Philippe had an average annual income of $45,000. After the accident Dr. Philippe could no longer practice dentistry because he did not have the requisite manual dexterity. He obtained employment as a consultant in dentisty earning $25 per hour, but he could only work a limited number of hours each week because the available consultation work was allotted on the basis of seniority. Dr. Philippe earned $10,000 in 1977, which was $35,000 less than his 1976 income. After considering the testimony of three economists whose opinions on loss of earning capacity ranged from $716,908 to $1,036,077, the trial court gave an award of $800,000. The Louisiana Supreme Court concluded that this award was not an abuse of discretion. During the course of its opinion the court noted that two factors to consider in determining impairment of earning capacity are: (1) "the probability or improbability that plaintiff would have earned similar amounts during the remainder of his work life, but for the injury," and (2) "the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity." Philippe, 395 So.2d at 317.
*1293 In Coco, the plaintiff lost all four fingers and most of the palm of his dominant right hand in an accident. The accident happened in 1970 when Coco was 20 years old and had a life expectancy of 45 years. Prior to the accident, Coco had several manual labor jobs at which he earned minimum wages. After the accident he went to a rehabilitation school and learned to be a mechanic. Coco's injury left him with a 60 to 70 percent loss of function of his hand and 35 to 40 percent impairment to his body as a whole. Coco's boss in his mechanic job testified that an unimpaired person who did the mechanic work done by Coco would earn three to eight thousand dollars per year more than Coco did. Based on this fact, an economist testified in the trial court that Coco had an average annual loss of earnings of $5,000 per year and over his 45 year life expectancy he would suffer future loss of wages of $225,000 ($5,000 × 45). The trial court jury gave a lump sum damage award of $350,000. A majority of the court of appeal five-judge panel reduced the lump sum award to $140,000 and allocated $75,000 to general damages and $65,000 for loss of earnings. The Louisiana Supreme Court declined to speculate on what amounts were allocated by the jury for general damages and loss of earnings and concluded that "the jury did not abuse its much discretion in concluding that plaintiff was due for his injury the total sum of $350,000." Coco, 341 So.2d at 337. During the course of its opinion the court noted that full indemnification under La.C.C. art. 2315 includes damages for decreased earning capacity which is determined by deducting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury, and not by deducting his income after the injury from his income prior to the injury. Coco, 341 So.2d at 338.
Thus, even though Hobgood did not suffer an actual loss of earnings, he may recover for loss of earning capacity (ability).

The Economist's Opinion
Hobgood presented the testimony of Dr. Seymour S. Goodman, an expert economist, by way of deposition. Dr. Goodman's written report was attached as an exhibit to the deposition. The defendants did not present the testimony of an expert economist.
Dr. Goodman observed in his report that Hobgood had a 19.6 work life expectancy from the date of trial, any anticipated future loss of earnings should be discounted by 9¼% per annum, and the applicable annual inflation rate (consumer price index) was 6.31%. In his written report, Dr. Goodman set out the facts upon which he based his opinion as follows:
1. Mr. Hobgood was self-employed and the sole owner of Hobco, Inc. at the time of his injury, and remains so today. However, as a result of his injury, he has been unable to maintain the same degree of effort in operating his business, specifically in contacting potential new customers and keeping in touch with old customers, and he has not been successful in hiring additional salesmen to help him because of the comparatively small size of his business and the preference of his clients to deal with the owner himself. How much he has lost in earnings and can be expected to continue to lose cannot be judged simply by the salary he has paid himself since that salary could be smaller than the profits he has generated (producing therefore retained earnings for his corporation) or it could be larger (therefore producing a loss on the books of the firm). Hence, his true "earnings" should be measured by the firm's operating profit (or income or loss "before other items") on the books of the firm to which is added his salary or "draw". Viewed in this light, in calendar 1982, the year of injury, Mr. Hobgood's "earnings" amounted to $337,805.85, of which salary was $45,550. It should also *1294 be noted that these results do not adjust for the adverse impact on "earnings" that may have followed in 1982 from the fact that Mr. Hobgood was injured nearly a full two months before the end of the calendar year.
Mr. Hobgood's "earnings" in the following years, specifically 1983 through 1986, have not approached 1982. An average of these subsequent years is only $30,000. Since these years have also been years of recession for Louisiana, which can be dated on the basis of the "rig count" as starting in the beginning of 1982, the reduction in "earnings" since 1982 must also be attributable in substantial measure to the recession as well as to Mr. Hobgood's injury, especially for a firm like Hobco, Inc., which in [sic] dependent on activity in the "oil patch".
It would seem that a quite liberal estimate of the impact of the recession on the earnings of Hobco, Inc. would be that it would have reduced Mr. Hobgood's 1982 "earnings" by an average of four-fifth, or 80%, over each of the subsequent years. On this basis, therefore, Mr. Hobgood's average "earnings" for 1983-1986 would have been, approximately, $67,500 annually had it not been for his injury. Hence, his injury would then have accounted for the difference between this estimate of $67,500 and the actual annual average for 1983-1986 of $30,000, making for an average annual loss of "earnings" resulting from the injury of $37,500. This figure of approximately $37,500 is therefore my estimate of Mr. Hobgood's earnings loss for the years 1983 through 1986 (with no loss assumed for 1982) and for all of 1987 as well.
Based on these facts, and after taking into account Hobgood's work life expectancy, the discount rate and the inflation rate to calculate future losses, Dr. Goodman calculated Hobgood's past earnings loss from the date of the accident to the date of trial as $181,855.72, and his prospective earnings loss after the trial (November 4, 1987) as $564,191.75, for a total earnings loss of $746,047.47.
A review of Dr. Goodman's report shows that the facts upon which he has based his opinion are not the same as those testified to by Broussard or those that appear in Hobgood's income tax returns. Dr. Goodman indicates that Hobgood's 1982 salary from Hobco was $45,550. Broussard testified that Hobgood's 1982 salary was $48,000.[3] Dr. Goodman apparently determined Hobco's net income for 1982 was $292,255.85 ($337,805.85 minus $45,550). Broussard testified Hobco's accrual accounting income was $284,000. Dr. Goodman indicates that Hobgood's earnings for 1983 through 1986 only averaged $30,000. Broussard testified that Hobco's accrual accounting incomes for 1983, 1984, 1985 and 1986 were$25,000, $25,000$48,000 and$55,000, respectively, for an average of$25,750 per annum. Hobgood's actual cash income for tax purposes for 1983, 1984, 1985 and 1986 were $70,351, $77,308, $82,964 and $92,451, respectively, for an average of $80,770 per annum. Dr. Goodman calculated what Hobgood and Hobco should have made during 1983 through 1986 by reducing the $337,805.85 1982 earning figure by 80% to account for the recession in the "oil patch", and arrived at a figure of $67,500 (rounded off). By subtracting his actual earning figure of $30,000 from the expected income figure of *1295 $67,500, Dr. Goodman arrived at an annual income loss figure of $37,500. The record does not show any facts to support the 80% reduction factor. Dr. Goodman apparently calculated Hobgood's loss of earnings primarily on Hobco's financial status, rather than on Hobgood's actual income. Insofar as Hobco's financial status did not translate into an income gain or loss for Hobgood individually, this was error. Finally, Dr. Goodman's report and testimony does not show that he considered the Tong income of $17,452 in 1983 and $92,108 in 1984 in making his calculations.
It is well settled that the weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. Swann v. City-Parish, 492 So.2d 1225 (La.App. 1st Cir.1986); Hayes v. Commercial Union Assurance Company, 459 So.2d 1245 (La. App. 1st Cir.1984), writ denied, 462 So.2d 1247 (La.1985). When an expert opinion is based on assumed facts which are not supported by the record in the case, the opinion may be rejected. Holmes v. Southeastern Fidelity Insurance Company, 422 So.2d 1200 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983).
Dr. Goodman's opinion is based on facts which are not supported by the record. For this reason, we give it no weight.

Conclusion
The 1982 accident aggravated a pre-existing arthritic condition in Hobgood's spinal column. Over the years this condition gradually worsened and impaired Hobgood's ability to work as hard as he did prior to the accident. Calculating this loss is made more difficult because there was a significant recession in the oil and gas industry commencing in 1982 or 1983, and as people grow older they slow down their activities as part of the normal aging process. Further, even though Hobgood was injured in 1982, he started the Tong business in 1983 and he built it up to a $92,108 profit in 1984.
We find the following factors significant: (1) Hobgood continued to work at his same job (even though it was at a less strenuous rate) after the accident and until the time of trial. (2) There was no evidence that Hobgood would terminate his relationship with Hobco in the forseeable future. (3) There was no evidence of how Hobgood's injuries would affect his non-Hobco job capabilities. (4) Hobgood's actual, cash, taxable income increased from $70,351 in 1983 to $92,451 in 1986. This is $22,100 or 31% over a four year period during which there was a recession. (5) A 31% increase over the four years of 1983 through 1986 is 7.75% per annum, which is greater than the consumer price index (inflation rate) at that time of 6.31% per annum. However, under the holding in this case, Hobgood apparently is entitled to an award because he was deprived of the ability to work harder and earn even more.
After considering all of the facts of this case and all of the applicable law, we conclude that an award of $50,000 for diminution of earning capacity is fair to both parties while not being unduly oppressive to either. Compare Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La. App. 2nd Cir.), writs denied, 512 So.2d 1183 and 513 So.2d 1211 (La.1987).

DECREE
For the foregoing reasons, judgment is rendered in favor of Hobgood against Travelers for $50,000 with legal interest thereon from date of judicial demand until paid. Travelers is cast for all unpaid costs.
RENDERED.
NOTES
[1] Hobgood applied for a rehearing in this court asserting, in part, that he was entitled to a rehearing en banc because our judgment in this case was in conflict with our judgment in the Henry case. This court denied the application for the rehearing en banc. See Hobgood v. Aucoin, 551 So.2d 1362 (La.App. 1st Cir.1989).
[2] Hobgood gave the following testimony at the trial:

Q. Mr. Hobgood, with respect to your income and your loss of income. Who handles your income, your accounting and your taxes?
A. That is a CPA, Ronnie Broussard.
Q. He does all your business and personal work?
A. Yes, sir. That's correct.
Q. Do you personally have any idea what your losses are or is that better left to Mr. Broussard? Your losses, if any, I mean. Let me phrase the question properly.
A. He obviously handles all of that but over the years I've seen that; I feel like, you know, that there has been a Thirty or Forty Thousand Dollar ($30,000.00 or $40,000.00) decline annually.
Q. All right, sir. The specifics of which Mr. Broussard would have details on?
A. That's correct. He should.
This recapitulation summarizes the financial information contained in Broussard's testimony and Hobgood's income tax returns.
[3] At pages 153, 157, 159 and 162 of the record Broussard testified that Hobgood's 1982 Hobco salary was $48,000. We have accepted this amount for purposes of this opinion because the parties hereto appear to have done so. However, in Schedule W and Form 2441 attached to Hobgood's 1982 tax return, his 1982 Hobco salary is listed as $39,000. This discrepancy was not explored at the trial. If the $39,000 figure is correct, then Hobgood's actual cash income as shown on the recapitulation should be $68,152 rather than $77,152, and Hobgood did not experience an actual cash income loss from 1982 to 1983.