661 So.2d 636 (1995)
Royce Eugene ADAMS, et al., Plaintiffs-Appellants,
v.
COMMERCIAL NATIONAL BANK IN SHREVEPORT, Defendant-Appellee.
No. 27,360-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1995.
*637 Schober, Reyonds, Antee by Kenneth R. Antee, Jr., Shreveport, for Appellant.
Cook, Yancey, King & Galloway by Curtis R. Shelton, Shreveport, for Appellee.
Before MARVIN, LINDSAY and HIGHTOWER, JJ.
HIGHTOWER, Judge.
This is an appeal from a judgment dismissing a lender liability action seeking damages for the defendant's alleged failure to disburse loan proceeds properly. We affirm.

BACKGROUND
In early 1989, Royce Eugene Adams and Julius G. Johnson, with monetary assistance from others,[1] formed Geneco Plumbing Specialists, Inc. ("Geneco") to operate as a plumbing parts distributor to apartment complexes, housing authorities, motels, and similar business entities. Some of the initial investors obtained personal loans at area banks to provide Geneco with operating funds.[2] Another individual, apparently beyond contributing his own money, pledged *638 certificates of deposit to secure two other debts.[3] Although receiving stock in exchange for these funds, each of the participants except Adams and Julius Johnson considered their investments to be "loans" that Geneco would later repay.
In October 1989, in an attempt to consolidate debts and acquire additional inventory, equipment, and working capital, Geneco, acting through Adams and Julius Johnson, approached the Commercial National Bank in Shreveport ("CNB") about a $100,000 Small Business Administration ("SBA") guaranteed loan. After the company submitted an application to the federal agency, the bank soon received approval to disperse such proceeds in the following manner:

Equipment Purchases $ 3,400
Inventory Purchases $ 30,000
Working Capital $ 12,100
Debt Repayment[4]
 Homer National Bank $ 20,000
 Peoples Bank $ 4,000
 CNB $ 20,000
 American Bank & Trust $ 10,500
 _____________________________________________
Total $100,000

In accordance with Geneco's agreement in its application, the SBA required that the collateral for the transaction include a pledge of at least $55,000 in CD's, as well as an inventory mortgage and each shareholder's personal guaranty.
The closing for the SBA loan transpired on January 5, 1990, with Adams and Julius Johnson present for Geneco. Steve Hirt, a bank vice-president who had assisted in the application process, appeared for the lender. He advised that, inasmuch as Geneco could not otherwise provide the required collateral, a portion of the borrowed funds could be used to acquire the certificates to be pledged. Thus, with $34,600 of the loan proceeds, Hirt purchased a $21,600 CD in the name of George Byram, Sr., an $8,000 CD in the name of George Byram, Jr., and a $5,000 CD in the name of Julius Johnson.
At that time, Adams, as company president, executed in favor of the bank a $100,000 promissory note which set forth that the indebtedness would be secured by 1) Geneco's inventory; 2) the three abovementioned CD's purchased with a portion of the proceeds; 3) a $20,000 CD issued by CNB to James Patrick Johnson or Jeanne Johnson; 4) a $100,000 CD issued by CNB to James Patrick Johnson, with the security interest limited to $8,000; and 5) a life insurance policy on Adams. The bank, in furtherance of the arrangement, obtained a commercial security agreement signed by each individual or entity owning the various items of collateral. Also, each investor signed a personal guaranty obligating themselves in varying amounts for the loan.
As for the distribution of the remaining loan proceeds, CNB kept $28,000 to liquidate the $20,000 debt incurred by Geneco in August 1989, as well as an $8,000 cash advance against the SBA transaction. In the end, the balance of $37,400 went into the plumbing supplier's general and payroll accounts. Also, based upon a separately executed note, the bank provided the corporation with an additional $25,000 line of credit, from which the lending institution disbursed $15,000 to Geneco's general account on January 26, 1990, and $10,000 on February 16, 1990.
In early April, Geneco began to complain that it had not received the entire $100,000 loan amount. Having failed to read the loan documents, the corporation's officers lost sight of the $20,000 sum that satisfied the prior CNB loan and the $34,600 used to purchase collateral, i.e., the CD's placed in the names of the investors. In any event, prompted by the possibility of the federal guaranty being jeopardized by the borrower's complaints to the SBA,[5] the bank eventually agreed to restructure the loan.
*639 Thus, in June 1990, as part of such a restructuring, CNB released the pledged CD's by issuing the following cashier's checks:

"James Pat Johnson or Jeanne
Johnson" $19,919.27
"Julius Johnson" $ 5,067.10
"George W. Byram, Jr." $ 8,107.34
"George W. Byram, Sr." $21,899.41
_____________________________________________
Total $54,993.12

In turn, presumably with the authority of the investors receiving these funds, Geneco used the newly obtained funds to reduce the SBA loan balance to approximately $68,000, and to provide an additional $25,000 for its general accounts. Further, the bank increased the company's line of credit to $45,000 and advanced an additional $20,000 thereon. Even so, despite SBA approval of the measures undertaken, Geneco refused to execute those documents necessary for a renewal of the governmental agency's guaranty.
Subsequently, in November 1990, Adams, Julius Johnson, and Geneco filed the present lender liability action against CNB, claiming that the bank's failure to properly disburse the loan proceeds damaged the plumbing supplier through lost profits. Later, following default on the primary debt and several other notes owed by the corporation and/or its investors, CNB filed a separate proceeding against Geneco and its sureties to recover the outstanding balances. After consolidating the two cases and conducting a four-day trial on the merits, the district judge granted judgment in favor of the bank in its collection suit, while rejecting all of Geneco's claims in the other matter. This appeal ensued.[6]

DISCUSSION
Appellants maintain that the trial judge erred in rejecting their lender liability claims against CNB. Specifically, it is argued that Geneco adequately proved that the bank breached the SBA loan contract by improperly disbursing the proceeds, and that damages resulted to the borrower. We disagree.[7]
A trial court's factual findings are accorded great deference. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990); Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). If the district judge's findings are reasonable in light of the record in its entirety, the court of appeal will not reverse even when convinced that, sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). Put otherwise, the issue to be resolved by a reviewing court is not whether the fact-trier is right or wrong, but whether the conclusion reached is a reasonable one. Stobart, supra.
The breach of a contractual duty cannot be presumed. Morgavi v. Mumme, 270 So.2d 540 (La.1972). In an action for breach of contract, as in all civil matters, the burden of proof is upon the plaintiff to establish by a preponderance the elements essential to recovery. Id.; Bond v. Allemand, 632 So.2d 326 (La.App. 1st Cir.1993), writ denied, 94-0718 (La. 03/29/94), 637 So.2d 468.
Here, in reference to Geneco's allegations that the bank failed to disburse the entire amount of the $100,000 loan, the district judge issued comprehensive findings of fact concluding that "the proceeds were properly disbursed by CNB." Not only is that determination highly reasonable, but also our review leads us to the same conclusion.
As found by the trial court, Adams, the president of the debtor corporation, understood that Geneco would not have access to all of the loan proceeds. Definitively, he knew that $20,000 would be needed to repay the prior CNB loan, and, also, that his company did not otherwise have $55,000 in CD's *640 to secure the loan as required in the SBA application, which he signed. Likewise, in his trial testimony, Adams conceded that Hirt said nothing to foster any impression that the full $100,000, including the CD's purchased as collateral, would be available. Quite understandably too, the note signed by the corporation's officers contained no specific listing as to the utilization of the proceeds.
As the trial court also concluded, much of Geneco's dissatisfaction stemmed from the fact that the corporation's principals simply did not read the loan documents they signed. Indeed, on January 5, 1990, when they acquired the three CD's totaling $34,600, each individual certificate owner signed a commercial security agreement pledging his instrument with the bank. Of course, the fact that a person fails to read a contract is not a defense. Shreveport Great Empire Broadcasting, Inc. v. Chicoine, 528 So.2d 633 (La. App. 2d Cir.1988). It is hornbook law that a person signing a written contract is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that no person explained it to him, or that he did not understand it. Id., Bogalusa Community Medical Center v. Batiste, 603 So.2d 183 (La.App. 1st Cir.1992). Clearly then, considering the collateral listed in the promissory note and the various commercial security agreements executed, neither Geneco nor its principals should have expected access to all of the loan proceeds.
Even so, immediately upon the closing of the loan, Geneco derived the benefit of the entire $100,000 sum. First, taking into account the $8,000 sum advanced the preceding month by CNB, the plumbing supply company received $45,400 in its general accounts. Second, the corporation retired its August 1989 loan with CNB in the amount of $20,000. And, finally, the remaining $34,600 evolved into CD's, purchased in the name of Geneco's investors and used as security. Hence, the bank did not breach its contract with Geneco, and the trial judge did not err in so concluding.[8]
Nor did the trial court manifestly err in finding that Geneco did not prove that any damages resulted from the transaction. Damages for lost profits must be proved with reasonable certainty and will not be allowed where purely conjectural. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1984); A & W Sheet Metal, Inc. v. Berg Mechanical, Inc., 26,799 (La.App. 2d Cir. 04/05/95), 653 So.2d 158. In light of the internally inconsistent figures presented by Geneco in regard to its actual and potential profits,[9] the district judge reasonably concluded that "there is such confusion in the financial data supplied by Geneco, that no credible expert could render an opinion that Geneco incurred any amount of damages." Moreover, based upon the more reliable testimony from CNB's economic expert, the fact-trier determined that Geneco could never have been a viable business entity. Of course, the effect and weight to be given such expert testimony depends upon the underlying facts and rests within the broad discretion of the trial judge. Middle Tenn. Council, Inc. v. Ford, 274 So.2d 173 (La. 1973); Townsend v. Westinghouse Elevator Corp., 25,966 (La.App. 2d Cir. 08/17/94), 641 So.2d 1022, writ denied, 94-2371 (La. 11/29/94), 646 So.2d 403. See also, Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1st Cir. 1990), aff'd, 574 So.2d 344 (La.1990).

CONCLUSION
Accordingly, the judgment of the trial court dismissing appellants' lender liability action is affirmed in all respects. Costs of the appeal are assessed to appellants.
AFFIRMED.
NOTES
[1] Besides Adams and Julius Johnson, respectively the corporate president and secretary, other investors appear to have been George Byram, Sr., George Byram, Jr., and James Patrick Johnson.
[2] These individuals incurred the following debts:

a. George Byram, Sr.$20,000 note at Homer National Bank
b. George Byram, Jr.$4,000 note at Peoples Bank of Minden
c. Royce Eugene Adams$10,500 note at American Bank and Trust.
[3] James Patrick Johnson pledged two CD's to secure a $20,000 loan in August 1989 and a $8,000 loan in December 1989, both at Commercial National Bank.
[4] Although designated in the SBA documents as Geneco's indebtednesses, the listing included only one CNB note in the corporate name, along with the previously mentioned personal notes executed by various investors in obtaining funds to buy into the company.
[5] Apparently, the principal concern of the SBA pertained to the note proceeds having been utilized to acquire loan security rather than to satisfy existing debts.
[6] Appellants solely contest the district court's denial of the lender liability claims and do not challenge the judgment in favor of CNB for repayment of the various notes.
[7] Electing to resolve the case on its merits, we pretermit addressing the applicability of the Louisiana Credit Agreement Statute, LSA-R.S. 6:1121, et seq. For a discussion of how that statute relates to SBA loan documents, see our recent decision in Fleming Irrigation, Inc. v. Pioneer Bank & Trust Co., 27,262 (La.App. 2d Cir. 08/23/95), 660 So.2d 147.
[8] We also note that, as a result of the June restructuring, Geneco eventually received the monies invested in the pledged CD's.
[9] Geneco introduced the pro forma profit projections originally submitted with its loan application, its invoices as corroborated by Adams' testimony, and its 1989 and 1990 tax returns. Each set of figures, however, resulted in markedly different and irreconcilable calculations concerning the corporation's potential.