831 So.2d 428 (2002)
Deborah Blancq VOGT
v.
Gregory D. VOGT.
No. 02-CA-0066.
Court of Appeal of Louisiana, Fifth Circuit.
October 29, 2002.
*429 Robert G. Creely, Gretna, LA and Jana Smith Creely, Metairie, LA, for Appellant.
Robert C. Lowe, Terence L. Hauver, New Orleans, LA, for Appellee.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Appellant Gregory Vogt appeals a judgment of the district court granting a "Rule to Show Cause To Enforce Support Provisions of Matrimonial Agreement" filed by his former wife, Ms. Deborah Blancq. While we may find the contract to be disagreeable, we do not find it to be contrary to the law. Consequently, we affirm.
In October of 1992, attorney Mr. Robert Lowe was contacted in order to draft a pre-nuptial agreement between Mr. Vogt and Ms. Blancq. The agreement was ultimately executed on October 29, 1992, and the couple subsequently married on November 14, 1992. Two children were born of the marriage. Ms. Blancq filed for divorce in May, 2000, and interim support was granted. In May, 2001, Ms. Vogt filed a Rule to Enforce Support Provisions of Matrimonial Agreement. Following an evidentiary hearing, the court granted the Rule. Mr. Vogt appeals.
The agreement, dated October 29, 1992, and introduced into evidence at the hearing, states that the parties elect to be governed by Louisiana Community Property Law. It further states, in pertinent part:
The parties are aware of certain Louisiana jurisprudence proscribing agreements concerning alimony.... Notwithstanding any such jurisprudence, the parties acknowledge that, in the event that they divorce, and as long as Deborah L. Ms. Blancq has not committed adultery, as determined by a Court of competent jurisdiction, that Gregory D. Vogt shall pay to her monthly alimony at the time of the divorce and thereafter, in the amount of twenty (20%) percent of his gross annual income, which sum shall be reviewed annually, on the anniversary date of the divorce, so that Gregory D. Vogt shall pay Deborah L. Blancq twenty (20%) percent of his then prevailing gross income figure as monthly alimony.
According to the agreement, if Ms. Blancq "in her sole discretion", alleged that Mr. Vogt is unemployed or underemployed, she reserved the right to so claim in court, and upon judgment in her favor, *430 she would receive 20% of the gross annual that the Court determined Mr. Vogt should earn. The support would be payable until Ms. Blancq died or remarried, and would not be subject to any decrease or increase whatsoever, other than changes in Mr. Vogt's earnings. The agreement by its terms did not cover alimony pendente lite, the determination of which was left to the Courts, but rather was specific to post divorce support.
Mr. Vogt further agreed in the contract to maintain a life insurance policy of $500,000.00 in favor of Ms. Blancq as long as the spousal support was still due and payable. Both parties agreed that these provisions were in their respective best interests, and that the provisions would be enforceable by summary process. The agreement was signed by both parties and duly witnessed, notarized, and recorded. A proces-verbal was attached, in which both parties agreed that they had read and understood the agreement, and in which Mr. Vogt emphasized that he chose not to retain independent representation and that there was no duress, threat, fraud or any other impediment to the agreement.
At the hearing, Ms. Blancq testified that Mr. Vogt confessed to her that he had at least one dozen affairs during his first marriage. Prior to her marriage to Mr. Vogt, Ms. Blancq sought a pre-nuptial agreement because of the difficult divorce of her parents. She had several discussions about such a contract, and wanted to have financial security because she had agreed to give up her career at the time of their marriage. Mr. Vogt wrote a list of terms which he offered to her, a copy of which was admitted into evidence. In the document, Mr. Vogt offered to pay 50% of his net income as alimony for life regardless of fault or hardship; in the event the couple had children, he agreed to pay an additional 5% of his income per child until the children reached the age of 18. Ms. Blancq testified that she did not dictate the terms of this writing, which was made several weeks before she consulted an attorney.
She visited the attorney, Mr. Lowe, and brought the notes with her. Mr. Vogt accompanied her, but waited in the reception area because Mr. Lowe agreed to see only one or the other of them. Mr. Lowe suggested that the alimony provision be reduced to 20%, and draft of the agreement was sent to her and Mr. Vogt. Ms. Blancq introduced copies of correspondence from her attorney, in which Mr. Lowe requested she give a copy of the contract to Mr. Vogt. The letter also advised him to seek independent legal advice concerning the agreement. The letters were sent to her at her father's home, where she lived at the time. She did not live with Mr. Vogt until after their marriage. After receiving the initial draft, she and Mr. Vogt discussed some changes relative to the amount of life insurance Mr. Vogt would carry, and they both decided to increase that item. Another draft incorporating the changes was sent to her, with an extra copy to be given to Mr. Vogt.
At the time the agreement was signed, the notary and court reporter were present along with the couple and Mr. Lowe. After stating that he did not want to be represented by an attorney, Mr. Vogt signed the agreement. She believed that he did so because he loved her and wanted to give her financial security.
Mr. Vogt testified that Ms. Blancq told him she would not marry him unless he signed the agreement. He conceded that he wrote the earlier agreement, but testified that "... it was probably what Deb said she wanted in the contract." He was willing at that time to give her 50% of his net income if he committed adultery. Mr. Vogt testified that he never received a *431 copy of the draft agreements, and denied having any discussions with Ms. Blancq about the life insurance. He denied that he went to Mr. Lowe's office at any time prior to signing the agreement. On that day, he, Ms. Blancq, the court reporter and Mr. Lowe were present. Mr. Vogt did not read the document before signing it, but flipped through it. He thought that it contained the condition that the agreement would not be enforced unless he was unfaithful, because that is what he intended. He did not obtain legal advice, although Mr. Lowe gave him the opportunity, because "... what was said in the contract is of no interest to me..", and he was only interested in marrying Ms. Blancq.
Mr. Lowe testified that Mr. Vogt was with Ms. Blancq when they initially consulted him, and that he agreed to represent only one of them in drawing up the contract. Ms. Blancq came in, and the terms of the matter were discussed. Mr. Lowe sent a draft of the proposed agreement to Ms. Blancq, along with a copy to be given to Mr. Vogt. When the agreement was signed, Mr. Lowe asked Mr. Vogt if he had read it, and if he wanted an attorney. After the agreement was signed and recorded, Mr. Lowe sent correspondence with the recordation information, and later, sent copies of the proces verbal, to Ms. Blancq with additional copies for Mr. Vogt.
Mr. Prados testified that he was present at the reading and signing of the agreement, before he notarized it. The court reporter, Ms. Donna Bravender, testified to the same effect.
Although the trial court took the matter under advisement, the judge stated that Mr. Vogt's testimony, that he did not read the agreement, was unbelievable, and the court found no fraud or vice of consent. In its written Reasons for Judgment, the court found that the contract was executed in the presence of both Lowe, Prados and two witnesses as well as the parties. The court determined that the agreement did not violate public policy and was enforceable.[1]
Mr. Vogt argues that the parties believed they were executing a "Matrimonial Agreement" under LSA-C.C. Art. 2328. That article states:
A matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime. Spouses are free to establish by matrimonial agreement a regime of separation of property or modify the legal regime as provided by law. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect.
Because in their agreement, there was no alteration of the community property regime, according to Mr. Vogt, there was no requisite "meeting of the minds". Thus he urges that the court erred in determining the contract was a valid "matrimonial agreement" in accord with the article.
At the outset, we find no abuse of discretion in the determination of credibility made by the trial court. The testimony of Mr. Prados is clear that he was, at best, careless in his attitude regarding the entire legal proceedings, and even if he did not read the agreement, it was his obligation to do so. A person signing a written contract is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that no person explained it to him, or that he did not understand it.[2]
*432 Next we note that the title affixed to a document does not, of itself, control its character. Instead, the character of a document is determined by examining the entire writing.[3] More cogently, Mr. Vogt is correct that the agreement in question is clearly an antenuptial contract not contemplated by C.C. Art. 2328. However, it is a matrimonial agreement permitted under LSA-C.C. 2329, which reads as follows:
Spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy.
Spouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules. They may, however, subject themselves to the legal regime by a matrimonial agreement at any time without court approval.
During the first year after moving into and acquiring a domicile in this state, spouses may enter into a matrimonial agreement without court approval.
The Louisiana Supreme Court has found that a premarital contract waiving permanent alimony is subject to the rules of conventional obligations and is permissible under this article and other articles of the Louisiana Civil Code.[4] The court concluded that permanent alimony is not a law enacted for the public interest, but rather was enacted to protect individuals, i.e., not-at-fault divorced spouses in need, and therefore could be waived. We find no reason in the present circumstances to distinguish the present premarital contract, which provides for payment of permanent alimony. Had the proposed agreement handwritten by Mr. Vogt been at issue, some clear public policy issues might well have arisen in that he would have obligated himself to pay 50% of his net income for life regardless of Ms. Blancq's fault, the length of the marriage, or any financial hardships on himself. The contract before us specifically requires Ms. Blancq to be free from the fault of adultery and is thus not "a premarital understanding which repeals or amends the nature of marital obligations."[5] The alimony obligation ends upon Ms. Blancq's death or remarriage.[6]
The McAlpine Court found that certain prenuptial agreements "provide couples with the opportunity to plan for the future and safeguard their financial interests."[7] The agreement at issue is just such a document, and as such it does not seek to derogate from laws enacted for the protection of the public interest, in violation of LSA-C.C. Art. 7. It does not amend the nature of the future marital obligations, and we see no public policy which is prohibited by the antenuptial agreement before us.
Mr. Vogt also argues that the contract is gratuitous, in that he received no consideration in exchange for his agreement to pay *433 the alimony and maintain the insurance policy, and that Ms. Blancq gave nothing in exchange for such. According to LSA-C.C. art.1910, a contract is gratuitous when one party obligates himself towards another for the benefit of the latter, without obtaining any advantage in return. Mr. Vogt testified that he agreed to the contract because Ms. Blancq would not otherwise marry him. The contract was, at least at the time of its confection, mutually beneficial to both parties. Both testified that they desired to marry, but Ms. Blancq required financial security to which Mr. Vogt agreed without protest in order to obtain the advantage which he proclaimed was most desirable to him, i.e., the marriage. Both parties had to fulfill the necessary condition of marrying each other. We note that Mr. Vogt received the added advantage of limiting the amount of any future alimony obligation to 20% of his gross income. At the time of the agreement in 1992, under LSA-C.C. 112, the court was permitted to award alimony after divorce up to one-third of the income of the payor spouse, and was not limited to net income. In evaluating "income" within the meaning of this codal article, the trial judge could consider both gross and net income.[8] According to the contract, the amount could not be increased due to any detrimental change in Ms. Blancq's circumstances. Therefore, by contractually limiting alimony liability to 20% of his gross income, Mr. Vogt received an advantage in exchange for a promise to pay.
Mr. Vogt also argues that the contract is invalid because it is a prohibited inter vivos donation of future property under LSA-C.C. Art. 1528. Permanent alimony is not a donation of future property but is rather, under certain statutorily created circumstances, a consequential obligation of the marriage contract. Further, as found above, Mr. Vogt received an advantage, or consideration, for the alimony provision.
Mr. Vogt failed to prove any defect of cause or consent, error, duress, or fraud in the antenuptial contract before the court. We find no error in the judgement of the trial court maintaining the agreement, and we affirm. Mr. Vogt is charged with all costs of these proceedings.
AFFIRMED.
NOTES
[1] The court cited as authority McAlpine v. McAlpine, 94-1594 (La.9/5/96), 679 So.2d 85.
[2] Adams v. Commercial Nat. Bank in Shreveport 27,360 (La.App. 2 Cir. 9/27/95), 661 So.2d 636; Boh Bros. Construction Co. v. Price, 2000-2233 (La.App. 4th Cir.8/29/01), 800 So.2d 898, writ denied 2001-2623 (La.12/14/01), 804 So.2d 634.
[3] Smith v. McKeller 93-1944 (La.App. 1st Cir.6/24/94), 638 So.2d 1192.
[4] McAlpine v. McAlpine, 94-1594 (La.9/5/96), 679 So.2d 85.
[5] Contrast Favrot v. Barnes, 332 So.2d 873, 875 (La.App. 4 Cir.), writ denied, 334 So.2d 436, reversed on other grounds, 339 So.2d 843 (La.), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). See also Boudreaux v. Boudreaux, 98-791 (La.App. 3rd Cir.6/2/99), 745 So.2d 61.
[6] McAlpine, 679 So.2d at p. 93.
[7] McAlpine, 679 So.2d at p. 93.
[8] See Alford v. Alford, 610 So.2d 923 (La.App. 1 Cir.1992).