674 So.2d 1091 (1996)
Donna G. KILLOUGH, et al., Plaintiffs-Appellees,
v.
BITUMINOUS CASUALTY CORP., et al., Defendants-Appellants.
No. 28329-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
*1095 Lunn, Irion, Johnson, Salley & Carlisle by Frank M. Walker, Jr., Shreveport for Appellants.
Norman R. Gordon and Associates by W. Orie Hunter, III, Shreveport for Appellees.
Before MARVIN, GASKINS and CARAWAY, JJ.
GASKINS, Judge.
This appeal arises from injuries sustained by a nine-year-old boy when his right leg and foot became trapped in a pumping unit at an oil well. His injuries required several operations, including skin grafts and amputation of one-third of his right foot. The trial court rendered judgment in favor of the plaintiff and against the oil well operators. The defendants appeal the trial court's ruling on liability. The plaintiff answered the appeal, contending that the trial court awarded inadequate damages. For the reasons set forth below, we increase the total amount of damages from $249,933.92 to $262,208.92, but we assess comparative fault of 10% to the injured child. Therefore, the judgment in favor of plaintiff is amended to $216,790.18. We also affirm the award of $19,197.84 to the intervenor.

FACTS
On June 5, 1993, two days before his tenth birthday, Bryan Ringer was picking blackberries in the vicinity of the D.S. Owens Roth No. 2 well in Hosston, Louisiana. Bryan, his mother, his older brother, and his stepfather were visiting at the home of the stepfather's grandmother (hereinafter "the great-grandmother"). The well site was located about 129 feet from the great-grandmother's residence and 500 feet from a school and playground. The evidence demonstrates that Roth No. 2 was a stripper well which was constantly in motion. Somehow, Bryan's right leg and foot were crushed by a mechanical mechanism of the oil well pump. There were no witnesses to the incident. Bryan denied playing on the pumping unit and insisted that he had been picking berries when he slipped in oil on the ground.
Bryan was initially treated at North Caddo Memorial Hospital in Vivian, then transported by helicopter to the LSU Medical Center (LSUMC) in Shreveport. He was hospitalized at LSUMC for 24 days, during which time he underwent seven surgical procedures, which included several debridements of the wounds, skin grafts, and a transmetatarsal amputation of the right forefoot.
Bryan's mother, Donna Killough, filed suit individually and on Bryan's behalf. Named as defendants were the owners of the oil and mineral lease and the well equipment, Gary and Pamela Byargeon, d/b/a Byargeon & Sons Oil Company, and their insurer, Bituminous Casualty Corporation. The State of Louisiana, through the Department of Health and Hospitals, for the Medicaid Program, (hereinafter "intervenor") intervened seeking $19,197.84 for medical assistance payments made on behalf of Bryan.
Bench trial was held February 21, 22, 23, March 15, and April 6, 1995. The trial judge also made an on-site inspection of the accident site. In rendering judgment in favor of the plaintiff, the trial court found that the child was injured by the well pump in question. The court further found that the well site was open to the public without adequate warnings, safety barriers, or fences, and that such condition rendered it unreasonably dangerous. However, the trial judge stated his belief that the child was not entirely honest in his account of how the injury occurred and that the child was actually playing on the pump well when he was injured. Nonetheless, the trial court ruled that, based upon the totality of the evidence, the child was picking berries near the oil well "when he happened upon the well pump and perhaps in fact slipped."
In assessing damages, the trial judge further noted that he was not overly impressed with the health care plan established by the plaintiff's experts. The trial court awarded to the plaintiff damages of $230,736.08, subject to any applicable medical bill liens, plus legal interest from date of judicial demand; this sum included $155,000 for general damages.[1] The court also awarded judgment in *1096 favor of the intervenor in the amount of $19,197.84, plus legal interest from the date of judicial demand.
The defendants appeal the liability ruling. The plaintiff answered the appeal, contending that the damages awarded by the trial court are inadequate.

MANIFEST ERROR
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra.
When findings are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, supra.

Site of Injury
The defendants contend that the trial court erred in finding that Bryan was injured at the Roth No. 2 well instead of another well which was located closer to his great-grandmother's house. Bryan, his mother, his stepfather, and the stepfather's father all testified that Bryan was injured at the Roth No. 2 well. The stepfather further testified that there was blood and berries on the ground where he found the injured child. However, an employee of the Byargeons testified that he was sent by Mrs. Byargeon to the Roth No. 2 well within a few hours of the incident in response to information she received of a possible accident at that well site. He testified that he found no evidence that anyone had been near the Roth No. 2 well. He specifically found no blood or berries. Mr. and Mrs. Byargeon went to the site the next morning with that same employee. They testified that they saw no blood, berries or disturbed vegetation near their well.
In determining where Bryan was injured, the trial court made a credibility call in favor *1097 of the plaintiff's witnesses. On the record before us, we are unable to find that the trial court committed manifest error on this issue.

Maintenance of the Well
In its oral reasons for judgment, the trial court found that the oil well site was open to the public without adequate warnings, safety barriers, or fencing. The court considered the local history of no accidents, the custom of the area of not fencing off such sites, and the costs associated with constructing safety barriers such as fences. Nonetheless, it found that a well pump like the Roth No. 2 was dangerous and hazardous, and that its owners were answerable for failing in their duty to make and maintain adequate safeguards to protect minors from injuries.
The defendants argue that the trial court erred in finding that they were at fault in maintaining the Roth No. 2 well. In oral argument, defense counsel conceded that wells such as the Roth No. 2 are dangerous. At issue is whether Roth No. 2 was unreasonably dangerous.
Under a theory of either negligence or strict liability, the plaintiff has the burden of proving the following: (1) that the defendants had custody of the property causing the damage; (2) that the property was defective because it had a condition that created an unreasonable risk of harm; and (3) that the defect was the cause in fact of the injury. Barnes v. New Hampshire Insurance Company, 573 So.2d 628 (La.App. 2d Cir.1991); Manchack v. Willamette Industries, Inc., 621 So.2d 649 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1170 (La.1993). Under a negligence theory, the plaintiff must also prove that the owner or custodian knew or should have known of the unreasonable risk of harm posed by the property. Barnes, supra; Manchack, supra.
To determine whether a particular risk is unreasonable, the intended benefit of the thing must be balanced with its potential for harm and the cost of prevention. Socorro v. City of New Orleans, 579 So.2d 931 (La. 1991). The burden is on the plaintiff to prove that the thing is defective, i.e., that it poses an unreasonable risk of harm. Manchack, supra.
Evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that the place was not dangerous and that the defendant did not have actual or constructive knowledge of a dangerous condition. Manchack, supra.
Mr. Byargeon testified that there are 300 to 400 wells in Hosston, and that only about 4 of them are fenced. He also testified that at the time of the accident, he had 130 wells in operation and that, to the best of his knowledge, there had been no other injuries on any of them. However, he testified that the cost of placing a fence around the unit would have been only about $100.
We find that, under the particular and narrow circumstances presented by this case, Roth No. 2 was unreasonably dangerous. The well was apparently located in a residential area of Hosston. It was stipulated at trial that the distance from the well to the nearest residence was 129 feet, while a school and playground were 500 feet away. Mr. Byargeon admitted that he was aware of the close proximity of the school and playground, as well as the presence of children living at the residence across the street from the great-grandmother's home. Nonetheless, he testified that he merely assumed children wouldn't go near the well because it was on private property. Such an assumption was unreasonable, particularly when considered in conjunction with the great potential for danger and the relatively low cost of prevention, i.e., a fence.
We affirm the trial court's finding that the well was unreasonably dangerous under the specific facts of this case.

Comparative Fault
The defendants further contend that the trial court erred in not assessing comparative fault against Bryan. We agree.
While giving oral reasons for judgment, the court made the following statement:
This Court cannot leave these factual determinations without expressing the *1098 Court's honest belief that the child was in fact playing on the pump well. After considering Bryan's testimony, the reports of Dr. Vigen [the psychologist who testified for the plaintiff], Ms. Boseman [one of Bryan's school counselors], the school records, this Court feels that Bryan was not totally honest with himself and to this Court and family about his account of how he happened upon the well pump. Yet the Court accepts the sufficiency of the totality of the evidence that Bryan was picking berries near the oil well site when he happened upon the well pump and perhaps in fact slipped.
The two findings of factthat the child was playing on the pump and that the child was not playing on the pump but slipped on oil on the groundare mutually exclusive. Furthermore, based upon our review of the record, the finding that the child was injured when he slipped on oil and slid into the pump mechanism is not only implausible but physically impossible. The testimony and the photos show that the pumping mechanism is elevated at least six to eight inches off the ground on a concrete slab. Also, Bryan testified that he was "thrown in the air" by the pump and that he landed at the spot where he was found by his stepfather, several feet from the well. (Corroboration for this statement is found in the testimony of Bryan's step-grandmother who was present on the day of the accident. She testified that she heard Bryan's older brother say that he had seen Bryan thrown in the air.) These facts weigh heavily against the assertion that the child "slipped" and slid into the pump, which then crushed his foot. To the extent that the trial court found that Bryan slipped and slid in the pump, it committed manifest error. However, the trial court's credibility determination that Bryan was less than truthful is supported by the record. The only plausible explanation for his injury was that he had gotten up on the slab and was actually playing on the pump at the time he was injured.
Given this determination that Bryan was playing on the pump, we find that it was manifest error not to assess comparative fault against him. This court must now determine what percentage of fault to attribute to Bryan.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985); Socorro, supra.
The contributory or comparative negligence of a child is measured not by the standard of self-care expected of an adult but rather the self-care expected of a child of his age, intelligence and experience under the particular circumstances presented to him. Howard v. Allstate Insurance Company, 520 So.2d 715 (La.1988).
After an appellate court finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement v. Frey, 95-1119 (La. 1/16/96), 666 So.2d 607. In the instant case, we must increase fault to the lowest percentage within the trial court's discretion.
At the time of the accident, Bryan was two days shy of his 10th birthday. While the evidence showed that the boy suffered from Attention Deficit Disorder (ADD) and a learning disability, it also established that Bryan was aware of the dangers posed by wells such as Roth No. 2. Bryan testified that he knew that such a well could hurt or kill him. He recounted being reprimanded by his mother on a previous occasion for throwing sticks at a well and being told to stay away from wells. His mother verified that she had warned him of the dangers presented by wells and instructed him to stay away from them.
*1099 Under the circumstances of this case, we find that the lowest percentage of fault against Bryan reasonably within the trial court's discretion would be 10%. Accordingly, the damages awarded will be reduced by that percentage of fault.

MARKED PHOTOGRAPH
The defendants contend that the trial court erred in allowing the plaintiff to question Bryan by use of photographs previously marked during the testimony of his stepfather. Specifically, they complain of the use of # P-3, photo # 3, a photo of the Roth No. 2 well and the area immediately surrounding it.
During his testimony, the stepfather was asked to mark the spot on the well which Bryan had identified as the part of the pumping unit that injured him; this information was supposedly imparted by Bryan during a 1993 conversation at their attorney's office. Subsequently, Bryan was shown the marked photo during his testimony and asked if the photo depicted the well where he was injured. Defense counsel objected to the question as leading on the basis that the marks on the photo suggested the answer. The court overruled the objection but restricted plaintiff's counsel to asking only general questions pertaining to this photograph. In compliance with the ruling, plaintiff's counsel asked only if the photo showed the well where he was injured. He did not question Bryan about any of the marks on the photo.[2] Bryan answered the question affirmatively.
We find no error in the trial court's action. The court limited what plaintiff's counsel could ask Bryan about the photo in question. Furthermore, we are not aware of any prejudice suffered by the defendants as a result. Bryan's identification of the Roth No. 2 well as the place where he was injured was thoroughly tested by defense counsel when he showed the boy three photos admitted as defense exhibits, one of the Roth No. 2 well and two of the other well near the great-grandmother's house. Bryan was able to identify the photo of Roth No. 2 but not the photos of the other well. Additionally, Bryan was able to identify the Roth No. 2 well on # P-1, a videotape of the area which, of course, was not marked.

PAST MEDICAL EXPENSES
The defendants complain that the trial court's award of past medical expenses effectively allowed the plaintiff an unfair windfall as to the LSUMC bills. Specifically, the defendants argue that since LSUMC is precluded by law from accepting payment of its bill in excess of the amount paid by Medicaid/Medicare, the judgment should be reduced by $25,483.02, the difference of the total LSUMC charges of $44,680.86 and the Medicaid lien of $19,197.84.
At trial, the plaintiff introduced evidence of medical bills of $44,680.86 incurred at LSUMC, for which the trial court allowed recovery and $19,197.84 of which was awarded to the intervenor Medicaid Program for the medical assistance payments it made on Bryan's behalf. The defendants then filed a motion for new trial in which they alleged that the award of past medical expenses should be reduced. In support of the motion, they attached an affidavit by the attorney in charge of collecting money owed to LSUMC in which he stated that, by agreement with Medicare/Medicaid, LSUMC is precluded from collecting monies from individual for services or from third party tortfeasors and/or their insurers, and that LSUMC is precluded from accepting payment on such accounts in excess of what is paid by Medicare/Medicaid. The trial court denied the motion for new trial.
A new trial shall be granted when the verdict appears clearly contrary to the law and evidence, when there is newly discovered evidence important to the cause which could not have been previously obtained, or if the jury was bribed or acted improperly. La.C.C.P. art. 1972. The judge may grant a new trial for good ground in any case. La.C.C.P. art. 1973. When considering a motion for new trial, the trial judge has *1100 wide discretion. Porche v. Winn-Dixie Louisiana, Inc., 93 2075 (La.App. 1st Cir. 10/7/94), 644 So.2d 699, writ denied, 94-2643 (La. 12/16/94), 648 So.2d 394. In the instant case, we find no abuse of the trial court's wide discretion. Consequently, the LSUMC affidavit may not be considered in determining the award of past medical expenses.
Based on the evidence presented at the trial on the merits, the award for past medical expenses was appropriate and, accordingly, is affirmed.

INADEQUATE DAMAGES
In the answer to the appeal, the plaintiff contends that the damages awarded by the trial court were woefully inadequate to compensate Bryan for his injuries.

General Damages
The plaintiff contends that the sum of $155,000 in general damages was abusively low and that an award of $500,000 is warranted.
General damages are those which may not be fixed with pecuniary exactitude. They instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitively measured in monetary terms. Kessler v. Southmark Corporation, 25941 (La.App. 2d Cir. 9/21/94), 643 So.2d 345.
The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993); Jones v. Thomas, 27140 (La.App. 2d Cir. 8/23/95), 660 So.2d 86, writ denied, 95-2351 (La. 12/8/95), 664 So.2d 426. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, supra. Only after such an abuse of discretion is noted will a resort to prior awards be appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn, supra.
Bryan's initial injury was extremely painful. The toes on his right foot were crushed, and he sustained a very deep tear in his right calf. Bryan was hospitalized for more than three weeks and underwent seven surgical procedures under general anesthesia. The crushing injury to the right foot required amputation of the front one-third of his right foot. He also underwent two skin graft procedures wherein a patch of skin was harvested from his left thigh to cover the amputation site. Bryan has scars on his legs.
As a result of his injuries, Bryan is very self-conscious. His mother testified that he wants to wear high socks, tennis shoes, and long pants all the time to conceal the loss of part of his foot and the scars on his legs. Bryan testified that as a result of his injuries he has been picked on by other school children. However, he admitted that he had always had problems with other children; this was apparently connected to Bryan's ADD.
While the award appears to be slightly on the low side, we cannot conclude that it is abusively low. Finding no abuse of the trial court's vast discretion to award general damages, we affirm the general damages award of $155,000.

Future Medical Expenses
The trial court awarded $12,000 in future medical expenses. The plaintiff contends that this award is inadequate. We agree.
An award for future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. Nevertheless, awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable costs. Kessler, supra. A plaintiff must show that the expenses more probably than not will be *1101 incurred. Gray v. Louisiana Downs, 585 So.2d 1238 (La.App.2d Cir.1991).
Dr. James Scott Lillich, an orthopedic surgeon, recommended that Bryan be fitted with a forefoot prosthesis or orthosis. He will require this item for the rest of his life, and it will have to be replaced periodically, probably on an annual basis. Charlotte Huddleston, a vocational rehabilitation counselor, testified that the life expectancy cost for this item would be $11,600.
However, there was also evidence supporting an award for exostosectomy surgery. According to Dr. Lillich, an exostosectomy is cutting off a spur of bone, in this case, extra metatarsal bone that has grown since the amputation. Ms. Huddleston estimated the cost of this surgery at between $5,000 and $7,000. The evidence strongly indicates that young Bryan will require at least one such surgical procedure, although the surgery may be postponed until he reaches skeletal maturity. Therefore, we award an additional $6,000 in future medical expenses for this procedure.
Additionally, we find that the testimony of Dr. Susan Vigen, Dr. Lillich and Ms. Huddleston supports an award of $6,000 for therapeutic psychological counseling to help Bryan adjust to and cope with the loss of part of his foot. We also find that the evidence requires an award of $675 for medical services for the duration of his childhood.
Accordingly, the award for future medical expenses is increased from $12,000 to $24,275.

Future Lost Earning Capacity
The trial court awarded damages of $21,500 for Bryan's loss of future earning capacity.
The Louisiana Supreme Court has gravitated to the nebulous concept of loss of earning capacity, and little evidence is required to trigger the application of the discretion of the trial court, now so vast that there is little room for adjustment on the appellate level. Williams v. City of Monroe, 27065 (La. App.2d Cir. 7/3/95), 658 So.2d 820, writs denied, 95-1998 & 95-2017 (La. 12/15/95), 664 So.2d 451, 452.
Awards for loss of future income or future earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. Williams v. City of Monroe, supra; Kessler, supra.
The factors to be considered in determining future lost income include the plaintiff's physical condition before and after his injury, his past work record and the consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that he would have continued to earn wages over the balance of his working life. A loss of future income award is not really predicated upon the difference between the plaintiff's earnings before and after a disabling injury. Such an award is predicated, more strictly considered, upon the difference between the plaintiff's earning capacity before and after a disabling injury. Kessler, supra; Odom v. Claiborne Electric Cooperative, Inc., 623 So.2d 217 (La.App.2d Cir.1993), writ denied, 629 So.2d 1171 (La.1993).
At the time of his injury in June 1993, Bryan was not quite 10 years old. He had been diagnosed as having ADD in about 1989 and had been prescribed the medication Ritalin. He also had a learning disability. As a result, his school grades were generally poor. According to the testimony of one of his school counselors, his school performance after the accident remained essentially unchanged.
School records reveal that in 1991, two years before the accident, Bryan's IQ tested at 99. In April 1994, about 10 months after the accident, his school records showed an IQ of 76. When Dr. Susan Vigen, a psychologist, tested him in January 1995, she found his IQ to be 71. Neither Ms. Huddleston or Dr. Vigen could satisfactorily explained such a severe reduction in his IQ, although Dr. Vigen testified that a physical trauma could affect a person's IQ if there was a blood shortage to the brain. She further testified that, to a lesser extent, emotional factors causing a child to withdraw and isolate himself could adversely affect a person's IQ.
*1102 Dr. Lillich assigned Bryan a 20% permanent disability rating due to the loss of his forefoot. When filling out a work capabilities evaluation, he placed several restrictions upon Bryan's physical abilities, most notably a restriction against prolonged standing or walking for more than four hours per eight-hour shift. However, Dr. Lillich conceded that much of this was based on speculation. He also testified that if the forefoot prothesis was successful, Bryan probably would be able to stand without limitation.
Ms. Huddleston, the vocational rehabilitation expert, testified that, due to his limited intellect, Bryan's best pre-accident hope was to become a manual worker. However, given his physical restrictions as a result of the accident, she testified that Bryan had lost access to 89% of the labor market. Ms. Huddleston further testified that the main restriction was his inability to stand for more than four hours per day. She concluded that the best for which he could aspire was an entry level position at minimum wage.
Assessing the adequacy of the award for future loss of earning capacity is made particularly difficult by Bryan's young age. His employment future cannot be predicted with any degree of accuracy. Given the ambiguous testimony based almost wholly upon speculation and the vast discretion of the trier of fact, who had the advantage of seeing and hearing the witnesses (including Bryan), we cannot find that the trial court abused that discretion.

CONCLUSION
The judgment of the trial court is affirmed in part and amended in part. The award of future medical expenses is increased from $12,000 to $24,275. We assess 10% comparative fault against the minor, Bryan Scott Ringer. Therefore, we recast the judgment, in part, as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of DONNA KILLOUGH, AS MANAGING CONSERVATOR/NATURAL TUTRIX OF THE MINOR, BRYAN SCOTT RINGER, and against GARY BYARGEON AND PAMELA RENEAU BYARGEON D/B/A BYARGEON & SONS OIL CO., and BITUMINOUS CASUALTY CORPORATION, in solido, in the amount of $216,790.18, plus legal interest thereon from date of judicial demand until paid.[3]
The award of $19,197.84 to the intervenor, State of Louisiana, Department of Health and Hospitals, for the Medicaid Program, is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] The judgment rendered by the trial court was for a lump sum. In its oral reasons for judgment, the trial court specified the amount of the general damages. Nowhere in the record are the individual amounts of the special damages set forth. However, at oral argument, counsel for both side agreed that they are as set forth in the following calculation. Of these, only the award for permanent disability is not contested on appeal.

$155,000.00 general damages
 12,000.00 future medical expenses
 15,000.00 permanent disability
 21,500.00 future loss of earning capacity
 46,433.92 past medical expenses
___________
$249,933.92 Total Damages
 -19,197.84 award to intervenor for Medicaid reimbursement
___________
$230,736.08 award to plaintiff

[2] This photo bears several marks. The "LX" denotes the spot several feet from the well where the injured boy was found, according to the testimony of the stepfather and the step-grandfather. The mark at issue in this assignment of error is the circled X on the machinery itself.
[3] general damages
24,275.00 future medical expenses
15,000.00 permanent disability
21,500.00 future loss of earning capacity
46,433.92 past medical expenses
___________
$262,208.92 Total Damages
 × .90
___________
$235,988.02 award after assessing 10% comparative fault
- 19,197.84 award to intervenor for Medicaid reimbursement
___________
$216,790.18 award to plaintiff