683 So.2d 299 (1996)
Don E. CARTER, M.D.
v.
Richard BAHAM, Colonial Lloyd's Insurance Company, United Services Auto Association.
No. 95-CA-2126.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1996.
*301 Roland L. Belsome, New Orleans, for Plaintiff/Appellant.
Timothy G. Schafer, Schafer & Schafer, New Orleans, for Defendants/Appellants.
Before SCHOTT, C.J., and CIACCIO, LOBRANO, PLOTKIN and WALTZER, JJ.
PLOTKIN, Judge.
In this personal injury case, tried before a jury, we are called upon to decide whether the plaintiff's trial tactics and conduct were improper and prejudicial; whether the jury committed manifest error in finding the defendant entirely at fault and awarding plaintiff $3,532,000 for lost past income and loss of future earning capacity; and whether judicial interest was properly limited to the policy limits.

I. Procedural History
On September 30, 1991, Dr. Don Carter was injured when his motorcycle collided with a vehicle driven by Mr. Richard Baham at the intersection of Chef Menteur Highway and Downman Road. Carter filed suit against Baham, who was underinsured; Baham's insurer, for whom the Louisiana Insurance Guaranty Association (LIGA) was substituted; and USAA, who insured Carter under a $100,000 automobile liability policy and a $2,000,000 umbrella liability policy.
USAA tendered the UM policy limit on the automobile liability policy but denied UM coverage under the umbrella policy. The parties agreed to bifurcate the trial of coverage from liability and damages. The trial judge found that USAA did not prove that Carter waived UM coverage under the umbrella policy. In Carter v. Baham, 94-0119 (La.App. 4th Cir. 10/13/94), 644 So.2d 1086, 1088-89, this Court reversed and dismissed, finding from the testimony of USAA employees that Carter validly rejected UM coverage, but the judgment of this Court was reversed and the judgment of the trial judge reinstated by the Louisiana Supreme Court in Carter v. Baham, 94-2809 (La.1/27/95), 94-2809 La. 1/27/95, 649 So.2d 967, 969 (per curiam), which found the trial court's evaluations of credibility and inferences of fact reasonable in light of the lack of documentary evidence.
Baham and LIGA settled with Carter for $9,900. After trial on the issues of liability and damages, the jury found Baham solely at fault and awarded Carter a total of $3,832,000: $50,000 for past pain and suffering; $250,000 for future pain and suffering;[1] $632,000 for past income lost; and $2,900,000 for loss of future earning capacity. The trial judge cast judgment against USAA for the policy limits on the two policies ($2,100,000) with credit for the amount already tendered under the automobile liability policy ($100,000) and interest from the date of judicial demand.

*302 II. Assignments of Error
USAA appeals contending (1) that the trial judge erred in permitting Carter's counsel to engage in tactics calculated to appeal to the passions and prejudices of the jury, (2) that the jury's findings of fact are manifestly erroneous, and (3) that the trial judge erred in permitting the introduction of tax records from Carter's professional corporation to prove Carter's earnings and earning capacity. Carter appeals contending that he should receive interest on the $3,832,000 calculated by the jury rather than the $2,100,000 rendered by the judge.

A. Plaintiff's Tactics
USAA contends that Carter's counsel engaged in a studied intent to appeal to the passions of prejudices of the jury throughout trial. Specifically, USAA asserts that it was denied a fair trial because Carter's counsel was permitted (1) to inform the venire that Baham and LIGA had settled, (2) to describe Carter's life and role in his community before the accident, and (3) to include inappropriate and excessive rhetoric in his summation.

1. Baham and LIGA's Settlement: The Trial Judge's Discretion During Voir Dire
The full transcript of voir dire is not part of the record. During voir dire, the trial judge informed the venire that Baham was no longer in the suit in determining whether potential jurors knew him. According to USAA, Carter's counsel reiterated this information during voir dire. USAA objected and requested a corrective admonition. The trial judge complied as follows:
I made a comment that [Mr. Baham] is no longer a party to this lawsuit, is no longer a defendant, but I want all of you to tell me do any of you have the impression that because he is no longer a defendant that someone admitted that he is at fault or in any way indicative that he is at fault in the accident? Did any of you draw the inference from what I said or what Mr. Belsome said? Because we want everyone to come in and if you have some notion in your head about the fault of the respective drivers because Mr. Baham is no longer a party to this lawsuit, let me know now because it is important to both sides. Did anyone get anything out of that to infer a finding of fault in this case on either side? I see no hands.
Did any of you get the impression that Mr. Baham may have had an insurance company that has paid some money on his behalf in this case and that is the reason he is no longer a party? If any of you have that impression that may have been inferred, please let me know.
Two members of the venire responded affirmatively and were eliminated by the court.
Voir dire is intended to provide a fair and impartial jury. Prospective jurors are questioned to discover bias or prejudice regarding the circumstances of the case. A trial judge is vested with broad discretion in regulating and supervising voir dire and in ruling on challenges. His rulings governing the selection of a civil jury will be reversed only when a review of the entire voir dire reveals that the judge abused his broad discretion. It is not infrequent during a civil jury trial that a party may settle, be dismissed, or exit the case for other reasons. Once this occurs, the trial judge is obliged to make an impartial explanation to the jury. Ordinarily, the trial judge will instruct the jury not to infer anything from a change in the status of the parties. In the instant case, Baham and LIGA were dismissed before voir dire. The trial judge had an opportunity to impartially investigate any feelings and impressions the prospective jurors may have gleaned from Baham's dismissal. We find that the trial judge acted within his discretion under the circumstances of the case to question the venire and remove two veniremen. This caution sufficed to prevent prejudice.

2. Carter's Background: The Scope of Witness Accreditation
Most lawyers begin direct examination by accrediting the witness, which means introducing the witness to the jury, humanizing him, and placing the witness at ease. Likewise, during Carter's testimony, Carter's counsel brought to the jury's attention Carter's *303 educational background, employment history, military service, participation in neighborhood clinics, and role in treating addicts and Medicaid/Medicare patients. USAA compares this to the information found objectionable by the concurring judges in Simon v. Fastig-Tipton Co., 92-173, p. 35-44 (La.App. 3d Cir. 3/22/95), 652 So.2d 1351, 1375-1381, writ denied, 95-1010 and 95-1013 (La.6/2/95), 654 So.2d 1111. In Simon, the concurring judges found an attorney's remarks improper given their inflammatory and irrelevant nature despite the failure of opposing counsel to object to them in every instance. The remarks in Simon, however, in which counsel suggested that a party was a tax evader, a supporter of David Duke, and a cruel and unfeeling trial lawyer, are far more inflammatory and prejudicial than any remarks made in the instant case. Modern trial practice permits an attorney to personalize his client to the jury in a reasonable manner subject to the regulation and discretion of the judge. Military, employment, and family history are important aids in weighing credibility. Fact finders compare personal histories to their own experiences to assess credibility and resolve conflicts in testimony and to evaluate liability and damages. Credibility is generally determined by evaluating the identity and background of a witness, considering the content of his testimony, and observing his demeanor. Direct examination is constructed by an attorney to present witness background, testimony, and demeanor in a favorable manner. Attorneys neglect to accredit a witness at their own and their clients' risk:
Usually the precious first few minutes of factfinder attentiveness are best spent in accrediting the witness. As soon as the factfinders are introduced to a witness, they will want to know something about that person so that they can assess the quality and believability of the testimony. They will want to sense if they like the person whom they will be asked to believe and perhaps to help. The lawyer should not scant this important part of the presentation.
Peter Murray, Basic Trial Advocacy 116 (1995). In the instant case, which amounted to a swearing contest between two drivers as to who had the green light at the time of the accident, the importance of credibility was further elevated. Moreover, background and career were relevant to the issue of damages. Developing this testimony was within the ordinary ambit of trial tactics. We find no error in admitting this information.

3. Summation: The Scope of Acceptable Tactics
During summation, Carter's counsel recited an apocryphal story about the English jury system, told the jury that USAA and its counsel ought to be ashamed, described USAA as a "dead beat" and Carter as a man who plays by the rules, and appealed to the jury to defend human dignity in this country. The purpose of closing argument is to draw together all of the facts and to present the theory of the case so that a fact finder may render a correct verdict. Counsel has wide latitude to fully discuss the evidence that was presented in the case, which includes any inferences, deductions, or analogies that may be reasonably drawn from the evidence even when the evidence itself is unreasonable. However, statements not based on evidence or which encourage the jury to resolve issues by passion or prejudice are improper during summation.
Plaintiff's attorney began his closing argument as follows:
Good morning. I got to tell you I'm a little nervous. This is the first time that I can remember being nervous in a courtroom since the very first time I ever walked in a courtroom. When I was younger my mamma used to work as a clerk in the old Federal courthouse and when she couldn't find a babysitter she would sit us up in the courtroom and we would sit and watch jury trials and I was amazed back then in the sixth grade how we, as citizens in our community, could sit and listen to the facts and circumstances in someone's life and render a decision.
I can remember maybe it was the third or fourth time that I was in a courtroom and a man who I later found out to be a Judge over there, sat down and started talking to me about it and he told me our *304 jury system developed over in England and he saidand this is a true storythat back in the 1680's what would happen is, you would go ahead and go through with your jury trial and then when the Judge would instruct the jury he would also tell the jury how the King wanted them to rule. And in this particular case back in the 1680's, they had charged some young man with rabble rousing and after the Judge was charging the jury he said, "And now it is the King's wish that this man be found guilty."
And the jury went out for a couple of days and they came back and the Judge said, "You have a verdict?" And they said, "Yes, we do. Not guilty." He said, "Wait. You don't understand. It is the King's wish that this man be found guilty, so go back and think about it some more."
So they went back. And back in those times the conditions were pretty bad and some of the jurors were getting sick and some were getting kind of nervous. They didn't know what the hell the King was going to do and so they came back four days later and the Judge said, "Do you have a verdict?" And they said, "Yes, we do, Your Honor. Not guilty."
And he said, "No!" And he asked the foreman of the jury and said, "Can we expect a verdict of guilty?" And the foreman stood up and looked that Judge in the eye and said, "Never."
That's how powerful our jury system is. That is what makes our system of justice in our country different from other places in the world, because we get members of the community who sit and judge credibility, judge motive and judge the facts of the case and determine what is reasonable for any given person when you bring a case to Court.
Counsel may properly argue and comment on matters of general knowledge and folklore outside the record. In argument, counsel may use illustrations based upon personal experience and refer to history, religion, myth, and literature. It was not improper for plaintiff's counsel to open his argument with an appeal to the jury to perform its duty.
Plaintiff's counsel continued in closing argument as follows:
And the third question: If these injuries are related to this accident, what reimbursement is Dr. Carter owed from his insurance carrier? Those are the three questions. That is what we are here to listen to and for you to try to determine based upon the witnesses that sat up here and testified. But instead, we sat here and USAA came into this courtroom and maligned and attempted to cast unsubstantiated dispersions [sic] against Dr. Carter's character and integrity. And they ought to be ashamed of themselves for doing so.
. . . .
Dr. Carter has played by the rules all his life, has done over and above what any of us should do to try to be successful people in our community and as a result of this he's been pushed back.
. . . .
Instead of coming into this courtroom and trying to be straight and find a way to fairly compensate Dr. Carter, they have come into here and cast aspersions on his character, on Bill Grant and Dr. Butler and there is no question what they were trying to do, there is no question at all.
Let me tell you what they are. They are dead beats; they are dead beats. They owe Dr. Carter this money and they don't want to pay Dr. Carter. He was a wonderful man until he made a claim against his own carrier and instead of believing Dr. Carter they chose to believe a man who pops up at the last minute.
In Louisiana, the wealth or poverty of a litigant is immaterial. Cf. Simon, supra at p. 35, 652 So.2d at 1375 (Cooks, Sanders, JJ., Concurring). One implication of plaintiff's argument was that the insurer had made a fortune by accepting premiums but refused to pay plaintiff's lawful claim. Suggesting that the insurer had improperly refused to pay its lawful debt to the plaintiff after accepting his premium is inflammatory. It was clearly improper for plaintiff's counsel to refer to the insurer as a dead beat. The trial judge should have immediately admonished the jury to disregard these statements under *305 his inherent power to regulate the trial in accordance with La. C.C.P. art. 1632.
Although we find counsel guilty of making an improper and inflammatory argument, it does not necessarily mean that reversal will follow. A review of the entire record reveals that USAA was not prejudiced to the extent that would justify reversal. This was a highly charged, emotional trial on both sides. The trial judge cured any prejudice that might result by clearly instructing the jury as follows:
You must deliberate on this case without regard to sympathy, prejudice or passion for or against any party to this suit. The case should be considered and decided as an action between persons of equal standing in the community. A corporation or an insurance company is entitled to the same fair trial as the individual Plaintiff. All persons stand equal before the law and are to be dealt with as equals in a court of justice.
After a review of the entire record, we find that this admonition sufficed.
Finally, in closing plaintiff argued the following:
Baham hasn't spoken to anybody in the last four years about the accident.
. . . .
But Baham shows up in this courtroom on Monday morning, the first time a USAA representative lays eyes on the man, first time they speak to him, first time that their TV expert sat there and talked to him.
. . . .
They believed Mr. Baham. Of course. "Of course you had the green light, Mr. Baham."
Now, does it make any sense to you?
. . . .
When Mr. Baham was sitting on the stand Mr. Schafer was like, "Poor Mr. Baham." I don't know what type of games are being played here but I'll tell you one thing, they weren't being fair and straight with Dr. Carter.
This argument was made to suggest that Baham, the dismissed party, was assisting USAA with its defense against a claim by Carter, USAA's insured. It was not improper. Counsel permissibly challenged the credibility of the witness, which was a significant issue in the case.
Common summation arsenals include body language and rhetoric, anecdote and analogy, which all can be used to evoke the common experience of the jurors and to emphasize the themes underlying an attorney's theory of the case. See, Murray, supra, at 353-378. An attorney has great latitude in using these techniques before a civil jury and a judge has great discretion in regulating them. After a careful review of the record, we do not find that Carter's attorney exceeded this latitude resulting in prejudice to USAA or that the trial judge abused his discretion. Moreover, the trial judge correctly instructed the jury to draw their own conclusions from the evidence and explained that "Neither the written pleadings, arguments by the lawyers nor any comment or ruling which I may have made is evidence." That admonition sufficed. Cf. Temple v. Liberty Mutual Ins. Co., 330 So.2d 891, 894 (La.1976). Accordingly, this assignment of error is without merit.

B. Findings of Fact
USAA also contends that two of the jury's findings are in error. Specifically, USAA asserts that the jury erred in concluding that Carter had a green light and that Carter was disabled as a result of the accident. A jury's findings on issues such as these are reviewed only for manifest error. See, e.g., Hoffert v. Allstate Ins. Co., 579 So.2d 1088, 1089-90 (La.App. 4th Cir.), writ denied, 586 So.2d 565 (La.1991), and Breaux v. Larkin, 93-2544, p. 5-6 (La.App. 4th Cir. 5/26/94), 637 So.2d 1313, 1316-17.

1. The Green Light
At trial, Baham testified that he was driving a four-door Ford Fairmont to work through light traffic in the early morning of September 30, 1991. Baham stopped in the left turn lane on Chef Menteur Highway at the Downman Road entrance to 1-10. He waited for a favorable light to make the turn. As he turned, his car was hit hard by an *306 unseen vehicle in the right side damaging both doors. He exited his vehicle and found Carter lying on the ground thirty to thirty-five feet away.
Carter testified that he was driving home down Chef Menteur Highway on a 1985 Harley Davidson in the early morning of September 30, 1991. He drove cautiously because he had a premonition that an accident would occur. When he was halfway down Danziger Bridge, the light turned green. He watched a truck pulling a trailer exit from the interstate and saw a car stopped in the turning lane. He collided with the car when it pulled out in front of him. After he was thrown from the motorcycle, he moved over to the curb.
This dispute is, in essence, one of who had the green light. The jury heard the testimony of Baham, Carter, and USAA's expert in accident reconstruction. The jury read the accident report. The jury accepted Carter's version of the accident to find Baham at fault for accelerating against the light into Carter's path. No testimony presented at trial was so internally inconsistent, implausible, or contradicted by objective evidence that this Court can find the outcome clearly wrong. See, e.g., Rosell v. ESCO, 558 So.2d 1360, 1363 (La.App. 4th Cir.1990). The evidence furnished a reasonable basis for the finding that Baham's fault caused the accident.

2. Carter's Injury
At trial, Carter testified that after the accident he declined to ride in the emergency unit and instead called a friend who drove him to the hospital. Another friend who was a physician at Methodist Hospital's emergency room treated him on his request when he arrived. It was determined that Carter had broken his ankle and he was referred to Dr. Butler, an orthopaedist. Dr. Butler later discovered that Carter had also fractured his coccyx. The ankle healed and the pain in his coccyx subsided but returned nine months after the accident. Carter said he has not sought continued treatment because he knows that there is little that can be done. At the time of trial, he experienced constant pain while driving or sitting, which required him to reduce his workload by a fourth.
Dr. Butler, an orthopaedic surgeon, testified that he treated Carter at Methodist Hospital on September 30, 1991. Carter had a fractured right fibula, some abrasions and contusions, a fractured coccyx, and a pre-existing degenerative disc. Dr. Butler immobilized the ankle with a plaster splint and examined Carter's ankle again on October 2, 16, and 30, 1991. Carter complained of coxigeal pain on September 16 and December 18, 1991. Dr. Butler opined that Carter has a ten percent residual disability as a result of persistent pain in the coxigeal area.
The jury observed the videotaped deposition of Dr. Cary, an orthopaedic surgeon retained by USAA. Dr. Cary testified that Carter was not experiencing pain from the accident when he examined him, that Carter's symptoms were unrelated to the accident, and that Carter has no residual disability.
The jury heard the testimony of Carter and orthopaedic surgeons retained by each side. The jury accepted Carter's description of his disability. No testimony presented at trial was so internally inconsistent, implausible, or contradicted by objective evidence that this Court can find the outcome clearly wrong. Rosell, supra. The evidence furnished a reasonable basis for the finding that Carter sustained in the accident fractures to his distal fibula and coccyx resulting in a ten percent disability. Accordingly, this assignment of error is without merit.

C. Lost Earnings and Earning Capacity
USAA also contends that the trial judge erred in allowing the income tax records of Carter's professional medical corporation into evidence. Specifically, USAA asserts that the corporation's gross income cannot be used to prove Carter's personal lost income and earning capacity, citing Afeman v. Insurance Co. of N. Am., 307 So.2d 399 (La. App. 4th Cir.1975). Carter's counsel responds that the corporation's tax records are relevant under Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1st Cir.), writ granted, 563 So.2d 889 (La.), and aff'd, 574 So.2d 344 (La.1990), and that Dr. Wolfson, Carter's expert *307 economist, properly used these records to estimate Carter's lost earning capacity.
In Afeman, supra, this Court ruled that the president and 90% owner of a corporation involved in kitchen design, manufacture, and installation could not recover for the corporation's decline in earnings that followed his personal injury. This Court stated:
If a corporation has sustained a loss then only that corporation can sue to recover it. Furthermore, the evidence does not causally connect the corporate losses (which occurred before the injury also) to plaintiff's injuries in any event. There is no evidence in the record which would show a loss of income attributable to plaintiff's injury and therefore we reverse this award.
Id. at 403 (citation omitted). We believe that the Afeman decision was grounded primarily on the insufficiency of the evidence. Moreover, Afeman did not involve a professional medical corporation solely owned by a physician like Carter's practice. Therefore, Afeman is not dispositive.
However, a professional's own loss of past and future earnings cannot be fairly determined from the business records of a professional corporation alone. Instead, an injured professional should provide personal tax records, which can be supplemented by all other evidence of income and expenses, including the records of the professional corporation. Without a professional's personal tax returns, a factfinder faces tremendous difficulty in evaluating such inherently speculative damages, which are at best, even when fully documented, insusceptible of calculation with mathematical certainty. The lack of adequate documentation in the instant case may have contributed to the jury's decision to embrace the testimony of an expert economist, whose methodology failed to consider the plaintiff's degree of disability.
Damages associated with earnings should be estimated on the injured person's ability to earn money, rather than on what he actually earned before the injury. Folse v. Fakouri, 371 So.2d 1120, 1123 (La. 1979). The jury has great discretion in fixing damages and this Court should rarely disturb a jury's award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In determining whether this discretion was abused, this Court must consider whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff. Schexnayder v. Carpenter, 346 So.2d 196, 198 (La.1977). After finding that the jury abused its discretion, this Court is limited in its review to establishing the highest or lowest point that was reasonably within the jury's discretion. Coco v. Winston Industries Inc., 341 So.2d 332, 335 (La.1976). Cf. Clement v. Frey, 95-1119, 95-1163, p. 5-7 (La.1/16/96), 95-1119 La. 1/16/96, 666 So.2d 607, 609-11 (reaffirming the Coco standard in the allocation of fault).

1. Loss of Future Earning Capacity
During the peak performance of Carter's corporation, Carter drew a salary of $230,000 from his corporation. Dr. Wolfson assumed a constant 6% growth rate for Carter's practice based on AMA data for similar practices in the same geographic area. Also from AMA data, Dr. Wolfson projected that Carter would practice until he reached age 70. Using the 1991 gross, Dr. Wolfson estimated that Carter would be deprived of $2,958,000 in future earning capacity (discounted at 7.5% to present value). The jury accepted Dr. Wolfson's testimony and awarded Carter $2,900,000 for loss of future earning capacity.
The Louisiana Supreme Court has gravitated to the nebulous concept of loss of earning capacity, and little evidence is required to trigger the application of the discretion of the trial court, now so vast that there is little room for adjustment on the appellate level. Killough v. Bituminous Cas. Corp., 28,329, p. 14 (La.App.2d Cir. 5/8/96), 674 So.2d 1091, 1101. Awards for loss of future income or future earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. Id. What a plaintiff earned before and after the injury does not constitute the measure of loss of future income or future earning capacity. Folse v. Fakouri, 371 So.2d 1120, 1123 (La. *308 1979). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Id. The factors to be considered in determining future lost income include the plaintiff's physical condition before and after his injury, his past work record and the consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that he would have continued to earn wages over the balance of his working life. Kessler v. Southmark Corp., 25, 941, p. 7 (La.App.2d Cir. 1994), 643 So.2d 345, 350.
Dr. Wolfson determined the loss of earning capacity, in essence, by comparing income before the injury, in this case the 1991 earnings of the professional corporation, with the expected income after the injury, in this case projected earnings assuming a growth rate suggested by the AMA. The speculative nature of this calculation is exacerbated by the absence of Carter's personal income tax records and the reliance on his corporate records, which include such business expenses as Carter's alimony and payments to his children. Neither Carter nor his accountant could adequately explain the flow of funds through the corporation; each testified that the other was best able to explain. Although awards for loss of future income or future earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty, we find that the procedure employed by Dr. Wolfson and the jury is fundamentally flawed. Although Dr. Wolfson considered Carter's past work record and the consistency thereof, and the probability that he would have continued to earn wages over the balance of his working life, Dr. Wolfson and the jury disregarded Carter's physical condition before and after his injury in estimating the amount he probably would have earned absent the injury complained of.
Thus, Dr. Wolfson improperly attributed all of the shortfall from projected earnings to Carter's physical condition caused by the injury and the jury clearly erred in accepting Dr. Wolfson's testimony. The evidence supported at best a finding that Carter was left with a ten percent residual disability. Viewing the evidence in the light most favorable to Carter, and relying on his own testimony about the impact of the accident on his work, it appears that Dr. Carter has reduced his workload by approximately a fourth, although other evidence suggests that Carter's actual reduction in work is far less or even nonexistent. Assuming Dr. Wolfson's method for predicting expected earnings to be valid, which assumption this Court must make in the absence of contrary expert testimony and in accordance with the Coco v. Winston standard, it is clear that only a fourth of the shortfall can be attributed to the physical condition caused by the injury. Therefore, the highest award for lost future earning capacity that was reasonably within the jury's discretion was one fourth of $2,958,000, which is $739,500.

2. Past Lost Income
For the reasons stated above, we also find the jury's award of $632,000 manifestly erroneous. Dr. Wolfson's estimate of past lost income from 1991 peak gross earnings should be reduced to a fourth from $632,439 to $158,109.75. However, there is other evidence of lost income in the record in addition to Dr. Carter's testimony that he reduced his workload by a fourth. Dr. Grant testified that he was offered the position of medical director at CPC Eastlake (which paid $80,000 for 10-15 hours per week) and at a methadone clinic (which paid $70,000 for 5-10 hours per week), which offers Grant attributed to Carter's inability to take on these additional responsibilities after his accident. At the time of trial, Grant made an additional $30,000 from covering rounds for Carter. From Grant's testimony, a jury would have had a reasonable basis for awarding as much as a $180,000 for past lost income. Therefore, we find that the highest award for past lost earnings that was reasonably within the jury's discretion was $180,000.
Thus, after a review of the record, we find that the jury's awards of $2,900,000 for loss of future earning capacity and $632,000 for past earnings lost cannot be supported under any interpretation of the evidence. Instead, we find that the highest awards reasonably *309 within the jury's discretion are $180,000 for past lost income and $739,500 for loss of future earning capacity. We note that these awards, despite reduction, remain extraordinarily generous considering the type of injury, the length of treatment, and the degree of disability, which resulted from Carter's injury.

D. Judicial Interest
Finally, Carter appeals contending that the trial judge erred in not awarding interest from the time of judicial demand on the $3,832,000 calculated by the jury. The parties on appeal dispute the definition of a judgment, the interpretation and possible interaction of language in the supplemental payment provisions of both policies, and the meaning of Martin v. Champion Ins. Co., 95-0030 (La.6/30/95), 95-0030 La. 6/30/95, 656 So.2d 991. Because we reduce the judgment, as discussed above, this assignment of error is rendered moot. Therefore, it will not be considered.

III. Judgment
Accordingly, the judgment is reduced to $1,219,500 ($50,000 for past pain and suffering, $250,000 for future pain and suffering, $180,000 for lost past earnings, and $739,500 for loss of future earning capacity) together with judicial interest from the date of demand until paid subject to a credit of $100,000 paid under the automobile policy, and the judgment is affirmed as amended. Costs are assessed to the appellant.
AMENDED; AFFIRMED AS AMENDED.
SCHOTT, C.J., concurs in the result.
WALTZER, J., dissents in part and concurs in part with reasons.
I agree with the majority's conclusions that the trial judge acted within his discretion under the circumstances to question the venire and remove two veniremen; and that the jury was not manifestly wrong in concluding that Carter had a green light and was disabled as a result of the accident.
I write separately, concurring in the majority's finding that the trial court did not err in developing information concerning Dr. Carter's background and career because I do not find the majority's conclusion that plaintiff's "counsel [was] guilty of making an improper and inflammatory argument" is supported by the law or the record. There is nothing in the majority or concurring opinions in Simon v. Fastig-Tipton Co., 92-173 (La.App. 3 Cir. 3/22/95), 652 So.2d 1351, 1375-1381, writs denied, 95-1010 and 95-1013 (La.6/2/95), 654 So.2d 1111 or La. C.C.P. art. 1632 to support the majority's conclusion. When taken as a whole, counsel's remarks to the jury constitute normal argument from the evidence adduced at trial.
I respectfully dissent from the majority's reduction of the jury's award of $3,532,000 to $1,219,500, subject to a credit of $100,000 paid under an automobile policy, together with judicial interest from the date of demand until paid. The majority opinion proceeds from a faulty assumption, that the salary withdrawn by Dr. Carter represented his actual contribution to the enterprise, and applies an essentially arbitrary percentage reduction of income to remove the effect of a 1991 contract that was subsequently terminated. It is clear that a sole owner of a professional corporation might decide for any number of reasons during any particular fiscal year to withdraw less than all of his contribution to the corporation's income for that fiscal year. His withdrawal is not a proper measure of his pre-injury contribution to the enterprise.
The majority's reduction by over $2,000,000.00 of the jury's award is inconsistent with the principles announced by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) and its progeny. The majority has substituted its economic theories concerning lost past and future earning capacity for those of the only expert economist who testified at trial, and has substituted its judgment concerning the proper measure of damages to compensate this particular plaintiff for his particular injury for the judgment of the trial jury. I do *310 not believe such substitutions are proper in the framework of our tri-partite judicial system.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Finding that the jury did not exceed its discretion, I would affirm the award.
NOTES
[1] Although USAA appeals the award of damages generally by claiming the award is based on the jury's manifest error in finding Baham at fault, USAA does not appeal the specific awards for pain and suffering.